UNIROYAL GOODRICH TIRE COMPANY, Plaintiff–Appellee,

v.

MUTUAL TRADING CORPORATION, Mohammad Shafiq and John P. Hauper, Defendants–Appellants.

Nos. 94–2915, 94–3799.

United States Court of Appeals, Seventh Circuit.

Argued April 6, 1995.

Decided Aug. 3, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Sept. 7, 1995.

Julia D. Mannix (argued), Champ W. Davis, Jr., Davis, Mannix & McGrath, Chicago, IL, Charles D. Knight, Edmund W. Sinnott, Charles E. Joern, Jr., Burke, Weaver & Prell, Chicago, IL, for Uniroyal Goodrich Tire Co. in No. 94–2915.

Stephen E. Ford, Richard T. Valentino, Alan P. Miller, Kiesler & Berman, Chicago, IL, John A. Dienner, III (argued), Sedgwick, Detert, Moran & Arnold, Chicago, IL, for Mutual Trading Corp., Mohammad Shafiq and John P. Hauper in No. 94–2915 and 94–3799.

Joel H. Spitz, Ross & Hardies, Chicago, IL, Julia D. Mannix (argued), Davis, Mannix & McGrath, Chicago, IL, Charles E. Joern, Jr., Jerry Kokolis, Burke, Weaver & Prell, Chicago, IL, for Uniroyal Goodrich Tire Co. in No. 94–3799.

Before BAUER, COFFEY, and FLAUM, Circuit Judges.

BAUER, Circuit Judge.

A jury found the defendants (collectively "MTC") liable for civil violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 *et seq.*, and for violations of various state laws. Uniroyal was also awarded its attorneys' fees and costs incurred in bringing this action. MTC appeals the verdict and the award of fees and costs. It also appeals the trial court's rejection of its counterclaims. Unpersuaded by its arguments, we affirm.

## I.

Throughout most of the 1980s, MTC purchased tires from Uniroyal Goodrich ("Uniroyal") and its predecessors and resold them in Saudi Arabia.[1] During the relevant period, Mohammad Shafiq was MTC's president and sole shareholder; John Hauper was MTC's Vice–President. Uniroyal's complaint alleges that MTC bribed a Uniroyal employee in order to induce him into providing MTC with confidential information and into assisting MTC with its plan to defraud Uniroyal. The picture presented by Uniroyal at trial illustrates how this unfolded.

### A. The Detroiter Scheme

It became apparent soon after MTC began selling tires in Saudi Arabia that MTC would develop into a significant customer of Goodrich's. Consequently, Goodrich offered MTC the exclusive sale rights to a tire model known as the Detroiter. This opportunity was potentially lucrative because although MTC had two competing Goodrich distributors, it would be alone in selling the Detroiter. To the dismay of its competitors, MTC achieved a significant degree of success with the Detroiter.

In 1986, MTC informed Uniroyal that an entity named Palmer Industries had begun exporting flawed versions of the Detroiter from Mexico into Saudi Arabia. Purchasers of the flawed tires were coming to MTC for refunds, and MTC had paid them. MTC requested that Uniroyal reimburse it.

Uniroyal insisted that MTC substantiate its claim for reimbursement by supplying Uniroyal with a list of the serial numbers for the returned tires. Uniroyal also instructed MTC to hold all the returned tires for Uniroyal's inspection. MTC submitted a list of serial numbers for 4,896 tires which matched Uniroyal's records of blemished tires it had sold in Mexico, and so Uniroyal reimbursed MTC. When Uniroyal representatives went to Saudi Arabia to inspect the tires, however, they were told that the majority of the tires already had been discarded. The tires which remained were not on Uniroyal's list of blem-ished tires or on MTC's list submitted for reimbursement, nor were they marked with the "appearance imperfect" designation as they should have been. Uniroyal subsequently discovered that the information on MTC's reimbursement list had been compiled from information supplied to MTC by Richard Germano, a Uniroyal pricing administrator. After further investigation, Uniroyal concluded that the claim for reimbursement was fraudulent.

### B. The Cooperative Advertising Scheme

Germano furthered MTC's position with Uniroyal in other ways. Uniroyal ran a cooperative advertising program under which Uniroyal would bear a portion of its customers' advertising costs. Germano administered this program for Uniroyal's international customers.

In 1988, with Uniroyal's blessing, MTC decided to enter the tire market in Nigeria. Under Nigerian law, MTC had to conduct business through a domestic entity. MTC selected a company called Multiplex Globe as its Nigerian liaison. Multiplex Globe was owned by Shafiq and MTC. MTC submitted requests for cooperative funds for the erection of several billboards and for magazine advertising. Germano approved all of these requests, reimbursing MTC for one hundred percent of its costs despite the fact that the program provided for a maximum reimbursement level of fifty percent. In total, Germano approved reimbursements close to $300,-000 for MTC. Upon discovering other fraudulent activity in MTC's account, Uniroyal dispatched its own internal auditor, Martin Wynne–Brown and a subordinate, Tom Taylor, to Nigeria to inspect the billboards. Their investigation uncovered some unsettling truths. First, they obtained estimates from two advertising agencies in Lagos, Nigeria, which placed the cost of the work done at approximately $25,000. Second, they learned that the billboards they had seen had only recently been erected. This was about two years after the reimbursements had been requested.

---

**1.** In 1986, the Uniroyal Tire Company merged with BF Goodrich's tire business to form the Uniroyal Goodrich Tire Company. We will refer to the premerger entities as UTC and Goodrich respectively, and the postmerger entity as Uniroyal.

Meanwhile, back at the Uniroyal ranch, the company's investigation was closing in on Germano. On February 29, 1990, Germano confessed to being "lenient" on MTC's advertising account. He also told company auditors that about the time he was handling the cooperative advertising payments for MTC, he had met with Hauper, MTC's Vice–President. Hauper gave Germano a plane ticket to London where Germano met Patrick Mehl, an MTC representative. Mehl gave Germano $15,000 which Germano deposited in a Gibraltar bank account. Ten months later, Germano received another $5,000 from MTC. (The two payments remained unreported in Germano's tax returns until he was deposed in this case at which time he filed an amended return reflecting the payments.)

### C. The Volume Bonus Scheme

Yet another instance of fraud arose from some creative bookkeeping with respect to MTC's account. Uniroyal had an incentive program which rewarded customers annually for high volume purchases. To be included in any given year's calculation, tires had to have been shipped and paid for. In December of 1987, Germano included in MTC's account an order for 50,000 tires which had not yet been manufactured let alone purchased and delivered. Moreover, Germano did not deduct those orders from the 1988 purchase tally. In fact, Germano added 80,000 tires to MTC's account which never existed. The result of Germano's shenanigans was an unearned credit to MTC's account exceeding $230,000.

### D. Other Schemes

Another scam involving Germano and MTC occurred after Germano agreed to help unload the excess inventory of a discontinued model known as the Reno tire. Germano shipped some of these to MTC but billed MTC for a cheaper type of tire, a model known as the ADV tire. Germano claimed MTC told him that the tires were ADV tires and not Reno tires. But testimony from those who saw the tires revealed that the tires were in fact the more expensive Reno tires.

In addition to these more elaborate schemes, Germano engaged in several isolated but no less serious actions most of which involved some creative bookmaking but all of which bestowed upon MTC a healthy windfall at the expense of his employer. He often charged MTC prices well below those authorized by Uniroyal and on one occasion, in direct defiance of his superior's directions, wrote off interest charges in excess of $38,000.

Subsequent to his confession to Uniroyal's auditors, Germano resigned, and Uniroyal severed its relationship with MTC. Uniroyal then filed a twelve-count complaint consisting of five civil RICO counts [2] and seven pendent state law counts. The defendants filed a five-count counterclaim, which alleged, among other things, that Uniroyal violated its contract by halting production of the Detroiter and by selling tires that were not as warranted.

The trial court granted Uniroyal summary judgment on some of MTC's counterclaims, and on the remainder, the trial court entered judgment as a matter of law in Uniroyal's favor at the close of the evidence. The jury then returned a verdict in Uniroyal's favor on the RICO counts and the state law claims. In total, Uniroyal was awarded approximately $2.8 million in damages. The court then assessed fees and costs against MTC in the amount of $1.4 million.

### II.

On appeal, MTC attacks the jury verdict from several angles. It also challenges the trial court's decision on its counterclaims and on fees and costs. We consider each in turn.

We begin with the state law claims because they also form the predicate of the civil RICO counts. MTC appeals the verdict on three counts of the complaint: intentional interference with contractual relations, violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS

---

**2.** Though the complaint contains five RICO counts, the pattern of racketeering activity alleged in each count is the same.

505/2, and common-law fraud. We review the evidence in a light most favorable to Uniroyal, to determine whether a rational trier of fact could have concluded that the evidence supported a finding of liability on each count. *United States v. Mokol*, 957 F.2d 1410, 1414–15 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 284, 121 L.Ed.2d 210 (1992). The standard of review is significant here because MTC ignores it in making its arguments. The flaw in MTC's sufficiency of the evidence claims is that each rests on a skewed view of the evidence that is far from favorable to Uniroyal.

■ For instance, Uniroyal's interference with contractual relations claim was based on MTC's bribing of Germano. MTC contends that the payments made to Germano were for unrelated consulting work, and therefore did not precipitate a breach by Germano. But that is not all that the jury heard. The jury heard that the payments were handled in a very secretive fashion, and that Germano concealed the existence of those payments from his wife, his employer, and from the Internal Revenue Service. The jury also heard that Germano had admitted to being "lenient" on MTC's advertising account. In light of this, the jury was justified in concluding that the payments had a more sinister purpose and that the consulting story was a hoax. Given the timing of the payments and Germano's actions which repeatedly improved MTC's position at Uniroyal's expense, it was reasonable to infer that MTC paid Germano to assist MTC in its various schemes to defraud Germano's employer.

■ In support of its statutory and common-law fraud claims, Uniroyal cited the Detroiter tire scheme, the cooperative advertising scheme, the Reno tire scheme, and the volume bonus scheme. The jury concluded that the evidence supported the allegations and found for Uniroyal on both counts. MTC contests the verdict, claiming that the evidence fails to show that MTC or its agents made a false statement of material fact.

MTC claims that the evidence of the Detroiter scheme consisted solely of testimony by Uniroyal representatives stating that they did not see all the returned flawed tires upon their visit to Saudi Arabia. MTC tried to show that the reason they could not see those tires was because the tires were stored away from MTC headquarters. This evidence alone, according to MTC, cannot sustain a finding of fraud.

MTC's claim again fails to account for all of the evidence. William Davies, one of the men dispatched to Saudi Arabia to verify MTC's claims pertaining to the blemished tires, testified that, despite Uniroyal's request to hold the tires for inspection, MTC had already discarded them. He also testified that the tires which were present were not designated as blemished or imperfect as they would have been had MTC's claim been authentic. Moreover, MTC's argument does not explain away evidence establishing that MTC obtained from Germano confidential Uniroyal information which facilitated MTC's attempt to claim credits for tires that were never returned to it. When all this is topped off with evidence of the clandestine payments made to Germano by MTC, the jury's finding of fraud is understandable.

■ MTC's portrayal of the evidence offered as proof of the other schemes is similarly one-sided and ultimately unpersuasive. MTC contends that the evidence offered to prove the Reno tire scheme was inadequate because Uniroyal did not show that Germano deliberately billed MTC for cheaper tires. Again, MTC simply argues in favor of one inference over another permissible inference. Germano admitted to rebilling MTC at the lower ADV prices without getting any confirmation on whether the tires were in fact ADV tires. It was up to the jury to determine the credibility of his testimony and to determine whether the adjustment was innocent or part of the concocted fraud. In light of evidence that Germano had made severe adjustments on prices and interest charged to MTC, sometimes in direct contravention of his superior's orders, the jury's conclusion was reasonable.

■ MTC attacks the evidence presented in support of the cooperative advertising scheme in a slightly different way. Uniroyal's evidence established two separate things with respect to this scheme. First, there was evidence that MTC's stated advertising

costs (approximately $300,000) far exceeded the going rates in Nigeria for similar work (approximately $25,000), and that Germano was reimbursing at a rate of one hundred percent of MTC's costs rather than the customary fifty percent. Second, Uniroyal provided testimony indicating MTC never actually posted the billboards for which it received funds until Uniroyal began its investigation. MTC claims that the evidence admitted in proving the market rate for advertising was inadmissible hearsay and that without this, the remaining evidence would have been insufficient. Since we believe the evidence on market rates was admissible, we decline MTC's invitation to reverse.

As part of its proof establishing that MTC was bilking Uniroyal, Uniroyal offered the testimonies of Martin Wynne–Brown and Olutora Senbore. Wynne–Brown was responsible for Uniroyal's internal auditing program and uncovered the scam involving Germano and MTC's fraudulent advertising claims. Senbore was an accountant in the Nigerian office of the accounting firm, Coopers and Lybrand, and was hired to investigate and report on MTC's Nigerian advertising operations. In their testimonies, Wynne–Brown and Senbore stated that MTC had requested and received reimbursement for amounts far in excess of what was typical in Nigeria for billboard advertising. Accompanying the testimony were two exhibits each containing estimates from two different advertising agencies located in Lagos, Nigeria. The first exhibit contained advertising prices from Insight Communications estimating that for similar work, Insight would have charged about $25,000 rather than the near $300,000 charged by Multiplex Globe and MTC. The second exhibit was a list of outdoor advertising rates charged by a company known as Adspace. Adspace's list indicated that for similar work, it would have charged between $10,000 and $20,000.

■ MTC maintains that the testimony and the exhibits should have been excluded as hearsay. MTC's argument is that the quotes given by the two advertising agencies were out-of-court statements admitted for the truth of what was contained in them and that without those quotes, Wynne–Brown

and Senbore could not testify on those prices because they did not know whether they were in fact true.

We believe that a proper foundation was laid for both exhibits establishing that the estimates were compiled in the regular course of business. And as the trial court noted, there is nothing to suggest that they lack trustworthiness. They were therefore properly admitted. Fed.R.Evid. 803(6). Moreover, the Insight and Adspace exhibits provide a reasonable basis for Senbore's and Wynne–Brown's testimony on market advertising rates in Nigeria, and therefore we believe the hearsay objections to their testimony were also properly rejected.

As an aside, we note that even without evidence of the market rates, the jury had a sufficient basis to find fraud in how MTC's advertising costs were reimbursed. In addition to the evidence indicating that the billboards were not up until Uniroyal began its investigation, there was unrefuted evidence that Germano was reimbursing MTC at twice the permitted rate. Even from this evidence, the jury could have concluded that MTC was swindling Uniroyal on the advertising.

■ We proceed next to consider MTC's challenge to the finding of RICO liability. Section 1964 of RICO imposes civil liability on those found liable for deriving money through a "pattern of racketeering activity." The remedies available to a successful plaintiff are plentiful: they include provisions for treble damages, costs, and attorneys' fees. 18 U.S.C. § 1964(c). The murkiness of RICO's parameters coupled with its alluring remedies have led many plaintiffs to take garden variety business disputes and dress them up as elaborate racketeering schemes.

At issue in this case is whether this dispute truly presents a pattern of racketeering. The vagaries of the statute itself make the task of defining this requirement formidable, to say the least. In two decisions, the Supreme Court has ruled out interpretations at either extreme. In its decision in *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the Court noted that the requirement of two or more predi-

cate acts was a necessary but not sufficient condition to a finding of a pattern. *Id.* at 496 n. 14, 105 S.Ct. at 3285 n. 14. In so doing, the Court implicitly repudiated the interpretation in some circuits which simply equated a finding of two or more predicate acts with a pattern. Instead, the Court reasoned that in order to establish a pattern, a plaintiff must show a relationship between the predicate acts and the threat of continued criminal activity. *Id.*

A few years later in *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 230, 109 S.Ct. 2893, 2896, 106 L.Ed.2d 195 (1989), the Court rejected the Eighth Circuit's construction of the pattern requirement. Under the rejected interpretation, a single ongoing scheme to defraud could not sustain a RICO finding; a plaintiff had to show at least two separate fraudulent schemes to prevail. After looking at the statute's legislative history, the Court concluded that Congress' preoccupation in enacting RICO was to curb the incidence of long-term criminal conduct. *Id.* at 240, 109 S.Ct. at 2901. In light of this purpose, the Eighth Circuit's requirement was counterproductive because it is not a necessary precondition to prolonged criminal activity that the perpetrators defraud their victims in more ways than one. The Court held, therefore, that a single scheme could support a finding of RICO liability. *Id.* at 241, 109 S.Ct. at 2901–02. The Court's outright rejection of bright-line tests in *Sedima* and *H.J. Inc.* ensured that the outcome of each particular case would rest on a fact-intensive analysis.

In conclusory fashion, the defendants argue that the trial court erred in failing to grant their motion for judgment as a matter of law, despite the jury's verdict. They claim that the evidence failed to establish anything more than an isolated and short-lived instance of fraud in an otherwise successful business relationship.

MTC's attempt to depict this as one single fraud is understandable. Our RICO jurisprudence is replete with examples of failed attempts to dress up state fraud claims as suave RICO cases using the expansive definitions of mail and wire fraud. In *Lipin Enters. v. Lee,* 803 F.2d 322, 324 (7th Cir.1986),

the plaintiffs alleged that a fraudulent acquisition of stock amounted to a RICO violation because it entailed a multitude of fraudulent statements and representations transmitted through the mails and wires. We rejected that assertion, holding that just because the complexity of the transaction creates the potential for a greater number of possible fraudulent acts does not mean that there is the requisite threat of continued criminal activity. *Id.* "[M]ultiple acts of mail fraud in furtherance of a single episode of fraud involving one victim and relating to one basic transaction cannot constitute the necessary pattern." *Jones v. Lampe,* 845 F.2d 755, 757 (7th Cir.1988) (quoting *Tellis v. U.S. Fid. & Guar. Co.,* 826 F.2d 477, 478 (7th Cir.1986)).

In *Olive Can Co. Inc. v. Martin,* 906 F.2d 1147, 1150 (7th Cir.1990), the defendants set up a sham corporation in an attempt to divert money from their own failing cookie manufacturing business and then concealed its existence from the plaintiffs who sold them supplies on credit. The district court had found that the scam was not continuous within the meaning of RICO because it was done to pay off one of the defendants' personal obligations. *Id.* at 1151. Hence, the fraudulent scheme had a natural ending with no threat of ongoing criminal activity. We agreed and affirmed the finding of no liability. *Id.* at 1152.

*Lee* and *Olive Can* notwithstanding, the existence of a single victim does not preclude the existence of a pattern of racketeering activity. In *Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1300 (7th Cir.1987), *cert. denied,* 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989), the plaintiff, Liquid Air, had leased compressed gas cylinders to the defendant, D & R. After D & R terminated operations, it was slow to return the rented equipment. *Id.* When Liquid Air began charging D & R a higher rate for the remaining 3,000 cylinders, D & R obtained the services of a Liquid Air employee, who, over the course of seven months, generated nineteen separate false invoices making it appear as if the cylinders were being returned. *Id.* We were consequently faced with deciding whether a single scheme which lasted seven months and defrauded one victim established a pattern of

racketeering activity. We held that it did. Crucial to our conclusion was the fact that each instance of false billing inflicted an injury separate and independent of the previous and succeeding instances of false billing. "[T]he repeated infliction of economic injury upon a single victim of a single scheme is sufficient to establish a pattern of racketeering activity for purposes of civil RICO." *Id.* at 1305.

In this circuit, we have looked to several factors in ascertaining the existence of a pattern: the number and variety of predicate acts, the length of time over which they were committed, the number of victims, the presence of separate schemes, and the occurrence of distinct injuries. *Olive Can,* 906 F.2d at 1151. Neither the presence or absence of any one of these factors is determinative, and though these factors may be helpful, the touchstones of the inquiry remain the elements of relationship and continuity. Of these factors, all but one weigh in Uniroyal's favor. The predicate acts were numerous and spread out over a period of years. Uniroyal offered proof of several different schemes, all intended to bleed money from Uniroyal. And each scheme caused a harm distinct from that caused by the others. Only the existence of a single victim, Uniroyal, favors MTC. By itself, that is not enough.

The distinctions between *Liquid Air* and *Lee* and *Liquid Air* and *Olive Can* command the outcome in this case. The potential expansiveness of RICO stems largely from the capacious definitions of mail and wire fraud. It is therefore hard to formulate a bright-line test for the pattern of racketeering activity based solely on the number of predicate acts. But from these three single-victim cases, we begin to see what distinguishes a pattern. In *Lee* and *Olive Can,* there was an interdependence amongst the predicate acts, and each act was not responsible for a discrete injury. The various fraudulent representations made in *Lee* did not inflict separate harms; rather they were all necessary to perpetrate one large fraud. Similarly, the predicate acts in *Olive Can* were all related to the perpetration of one scam which would have ended on its own. On the other hand,

in *Liquid Air,* each false invoice on its own deprived the plaintiffs of a specific amount of revenue. Each invoice represented a discrete attempt to defraud Liquid Air and had little to do with the previous or subsequent false invoices.

If this case is in any way distinguishable from *Liquid Air,* it is that it presents a stronger case for liability; the facts of this case put it squarely within RICO's ambit. Taken in a light most favorable to Uniroyal, proven at trial were the existence of at least four separate schemes all of which were designed to swindle money from Uniroyal and all of which utilized the mails and wires to further their ends. The existence of several schemes strengthens the support for the jury's verdict and satisfies the dictates in *Sedima* and *H.J. Inc.* The various predicates of mail and wire fraud occurred repeatedly over a period as long as three years and each scheme, though inflicted upon the same victim, caused separate and distinct injuries like those caused in *Liquid Air.*

We turn our attention to MTC's arguments pertaining to its counterclaims. MTC argues that all of its counterclaims were improperly rejected. After reviewing its arguments, we believe that only the decisions with respect to two counterclaims merit discussion. In the first counterclaim, MTC alleged that Uniroyal fraudulently misrepresented that its tires were of U.S. origin. The second counterclaim charged Uniroyal with breach of contract, and breach of the duties of good faith and fair dealing for discontinuing shipment of the Detroiter tire. MTC contends that it was error for the court not to allow these claims to go to a jury.

MTC's arguments fail to undermine the reasoned opinions of the district court. MTC received model XLM tires that were manufactured in Canada and the United States. Some of the invoices warranted that the tires were of U.S. origin while others claimed U.S./Canada as their origin. Although MTC claimed that tires manufactured in Canada were warranted as being of U.S. origin, the district court found, and MTC conceded, that MTC could not show that the Canadian tires were invoiced as U.S. origin tires. In this respect, MTC's claim of fraud

was speculative, and the district court, therefore, had little choice but to enter judgment as a matter of law in Uniroyal's favor. On appeal, MTC fails to point to evidence which might rebut the district court's conclusion.

■ As to the second claim, in the fall of 1987, Uniroyal ceased production of the Detroiter. MTC alleged that this caused MTC to suffer serious losses in the Saudi Arabian market. Yet, the hurdle which MTC failed to clear at trial remains uncleared and that is the issue of damages. Hauper estimated that MTC would have sold 10,000 tires per month for the remainder of 1987, 15,000 tires per month in 1988, and between 18,000 and 20,000 tires per month in 1989. MTC calculated its damages by multiplying these numbers by the average markup on the Detroiter tire. The problem is that none of Hauper's estimates had support. MTC did not submit into evidence any commitments or orders that supported the projections. Nor were they based on historical numbers. In fact, MTC had never averaged even close to selling 10,000 tires per month in the four years it had sold the Detroiter. Moreover, there was evidence that MTC's sale of other tires increased after production of the Detroiter was suspended, yet MTC neglected to account for the mitigation in its alleged damages. Given the lack of support for damages, the trial court was understandably reluctant to let the matter go to the jury. For all of the foregoing, we affirm the trial court's decision granting Uniroyal judgment as a matter of law.

■ Finally, we review the trial court's decision to award Uniroyal its fees and costs. Uniroyal's request for fees was predicated on Rule 54(d)(2) of the Federal Rules of Civil Procedure, 18 U.S.C. § 1964(c), 815 ILCS 505/10a(c), and Mohammad Shafiq's personal guaranty.[3] Because the trial court is far better situated to determine what costs and fees are reasonable, we will reverse its decision only upon finding an abuse of discretion.

*FMC Corp. v. Varonos,* 892 F.2d 1308, 1315 (7th Cir.1990).

■ As an initial matter, we believe that Uniroyal's entitlement to attorneys' fees cannot be disputed. Both RICO and the Illinois Consumer Fraud and Deceptive Business Practices Act expressly allow such an award, and where as is the case here, a plaintiff is entitled to fees arising from one claim, that plaintiff may also obtain fees for other successful claims arising from the same common nucleus of facts. *Hensley v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983). Moreover, in addition to the statutory provisions authorizing an award of fees, Shafiq's personal guaranty undoubtedly also contemplates attorneys' fees. *See Boulevard Bank Nat'l Ass'n v. Philips Medical Sys. Int'l B.V.,* 15 F.3d 1419, 1426 (7th Cir.1994) (guaranty's provision for "collection costs" included attorneys' fees). We therefore focus our inquiry on whether the amount awarded was reasonable.

■ MTC first takes issue with the number of attorneys who appeared on Uniroyal's behalf for pretrial court appearances and depositions. Specifically, MTC claims that Uniroyal should not be reimbursed for more than one attorney's time per court appearance or deposition. The trial court rejected this contention on the ground that it was not unreasonable for more than one attorney to attend certain pretrial motions in a complex litigation which spanned over four years and entailed substantial discovery. We agree with the court's assessment. In a case of this size, it would have been sensible for the attorneys to divide up the responsibilities of the pretrial litigation thereby necessitating that each attorney be present for court appearances. MTC fails to demonstrate otherwise, and therefore, we find the trial court's decision was eminently reasonable and well within its discretion.

---

3. As part of MTC's arrangement with Uniroyal, Shafiq agreed to personally guarantee obligations owed by MTC to Uniroyal. The relevant portion of Shafiq's guaranty reads:

The undersigned [Shafiq] does, absolutely and unconditionally, GUARANTEE, the punctual payment at maturity to you [Uniroyal] of

each and all of the Obligations, together with interest thereon and any and all expenses which may be incurred by you in collecting all or any of the Obligations and/or in enforcing any rights hereunder; and it is specifically agreed that the liability of the undersigned hereunder shall be UNLIMITED in amount.

MTC's next challenge to the award of attorneys' fees contends that Uniroyal overstaffed this case by dispatching two attorneys and a legal assistant to handle the trial full-time along with a third attorney who was in attendance part-time. Judge Bucklo found this to be a reasonable use of resources considering that the trial spanned a four-week frame and involved over 1,300 exhibits. Again, we find this determination perfectly reasonable. MTC claims that the length of the trial and the number of exhibits are misleading because this trial was straightforward and that the only reason the case could be considered complex was because Uniroyal "struggled to transform simple tort claims into RICO claims." Yet, an ever-increasing number of authorities including the jury, the trial court, and now this court, believe that Uniroyal presented a very persuasive RICO case. The complexity of the case justified the efforts of the team of lawyers.

Next, MTC claims that the trial court erred in failing to deduct from the award of fees, time spent on "failed and useless activities." Closer examination reveals that MTC wishes to exclude fees incurred for any work performed by Uniroyal's attorneys on motions which were eventually denied. MTC does not provide us with authority in support of this proposition, nor does our own review uncover any. Common sense, however, informs us that such a rule is inappropriate. There is a significant difference between frivolous claims and colorable but unsuccessful claims. Were we to deem unreasonable the reimbursement of fees incurred for the latter, we would be discouraging the type of representation attorneys are duty-bound to provide. So as long as statutes allow prevailing parties to recover attorneys' fees "reasonable" in amount, we are not prepared to link our definition of "reasonable" to whether the fees are incurred in pursuit of a successful task.

Before we turn our attention to the award of costs, we consider MTC's request that the costs of computerized legal research be subtracted from the award. MTC claims that these expenses are better characterized as overhead in the same way that mainte-

nance of a law firm library is. We reject this claim. In *Haroco v. American Nat'l Bank & Trust*, 38 F.3d 1429, 1440–41 (7th Cir.1994), after noting the similarities between computerized research and traditional manual research, we concluded that there was no reason to consider one type of research reimbursable as attorneys' fees and not the other. They are in their aims indistinguishable. We therefore affirm the trial court's inclusion in its award of attorneys' fees the costs of computerized research.

MTC also contests the award of reimbursement for the expenses Uniroyal incurred in obtaining the testimony of its experts and expenses incurred in copying documents. We can dispose of each of these claims succinctly. RICO authorizes the trial court to award a successful plaintiff "the cost of the suit." 18 U.S.C. § 1964(c). Before the trial court, MTC argued that Uniroyal had not adequately apportioned its expert witness fees to account for the claims in which the experts' testimonies were helpful and those claims in which it was not. Terming this argument "baseless," Judge Bucklo held that because the testimonies of Uniroyal's two experts were "reasonably necessary for Uniroyal to prove its case," their expenses were reimbursable. MTC argues for the first time on appeal that expert witness fees are not recoverable. Even if we were to ignore MTC's forfeiture of this claim, we would still reject it. In reaching its conclusion, the trial court relied on civil rights cases in which provisions which allow the award of a "reasonable attorney's fee" are construed to include the costs of expert witnesses. *See, e.g., Heiar v. Crawford County, Wisconsin*, 746 F.2d 1190, 1203 (7th Cir. 1984), *cert. denied*, 472 U.S. 1027, 105 S.Ct. 3500, 87 L.Ed.2d 631 (1985). Because we believe this analogy to be sound, we affirm the trial court's conclusion.

As for the award of Uniroyal's copying costs, the documents at issue were Uniroyal documents requested by MTC, some of which were eventually introduced by MTC at trial. MTC claims that rather than copying the requested documents and giving the copies to MTC, Uniroyal should have tendered

the originals to MTC and allowed MTC to copy them. As the trial court noted in rejecting this claim, the irrelevance of who did the photocopying is striking. MTC claims it could have saved money by copying only those documents it needed. But Uniroyal's reluctance to give out originals of important corporate documents is defensible. MTC also quibbles with the costs of duplicating and enlarging certain of Uniroyal's exhibits for the purpose of demonstration at trial. This claim is meritless, and again we defer to the trial court's determination that these demonstrative aids were helpful to the jury's understanding of the case.

### III.

The trial court's decisions entering judgment on the verdict, rejecting MTC's counterclaims, and awarding Uniroyal its fees and costs are in all respects

AFFIRMED.