**Belinda PETERSON, on her own behalf and on behalf of all others similarly situated, Plaintiff,**

v.

**H & R BLOCK TAX SERVICES, INC., a Missouri corporation doing business in Illinois, et al., Defendant.**

**No. 96 C 6647.**

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 29, 1998.

Cathleen M. Combs, Daniel A. Edelman, James O. Latturner, Ignacio Daniel Maramba, Edelman & Combs, Chicago, IL, for Belinda Peterson, plaintiff.

Theodore John Low, Altheimer & Gray, David H. Latham, Chicago, IL, for H & R Block Tax Services, Inc., defendant.

William A. Gordon, Charles Francis Regan, Jr., Mayer, Brown & Platt, Chicago, IL, for Compuserve, Inc., third-party defendant.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiff Belinda Peterson originally filed this lawsuit in Illinois state court alleging that the defendants, H & R Block Tax Services, Inc. and ten unnamed corporate officers (collectively "Block" or "Block Tax"), intentionally misrepresented benefits she would receive from Block's "Rapid Refund" tax service for the purpose of inducing her to purchase that service. In addition to four state law claims, Peterson presented two claims under the federal racketeering statute ("RICO"), 18 U.S.C. §§ 1962, 1964. Block removed the case to federal district court on the strength of Peterson's RICO claims. Subsequently, this court dismissed Peterson's fiduciary-duty claim under Federal Rule of Civil Procedure 12(b)(6), *Peterson v. H & R Block Tax Serv., Inc.*, 971 F.Supp. 1204 (N.D.Ill.1997), and granted her motion for class certification. *Peterson v. H & R Block Tax Serv., Inc.*, 174 F.R.D. 78 (N.D.Ill. 1997). Block now seeks summary judgment, attacking Peterson's ability to establish a genuine issue as to any of her allegations.

After carefully reviewing the parties' arguments and evidentiary submissions, we conclude that Peterson has not presented evidence supporting an inference that Block intended to defraud its customers or that Block poses a threat of continuing criminal activity. In other words, Peterson has not raised a genuine issue whether Block engaged in a pattern of racketeering activity. For this reason, we grant judgment in favor of Block on Peterson's RICO claims. Further, we decline to exercise our discretionary jurisdiction under 28 U.S.C. § 1367 and remand Peterson's state law claims to state court.

### FACTS[1]

**A. Relevant Circumstances Surrounding the 1995 Tax Season**

Under its Rapid Refund program, Block files its customer's income tax returns elec-

---

1. The parties generally agree to the factual history of Peterson's claims. Where the parties disagree, we will either disregard the fact in dispute or indicate the disagreement and, in accordance with the well-known summary judgment standard, relate the fact in the light most favorable to Peterson, drawing all reasonable and justifiable inferences in her favor. *Anderson v. Liberty Lob-*

tronically, thereby allowing the IRS to process the returns more quickly and mail refunds sooner. As part of the Rapid Refund program, Block offers customers the opportunity to apply for a Refund Anticipation Loan ("RAL") from an affiliated bank. An RAL is a loan against the expected amount of a customer's federal income tax refund. If the bank approves an RAL, it creates an account in the taxpayer's name and authorizes Block to issue a check to the taxpayer in the RAL amount. As part of the RAL application process, the taxpayer must authorize the IRS to deposit her refund directly into the taxpayer's account at the lending bank.

Prior to January 1995, an integral component of the RAL service was the Direct Deposit Indicator, or DDI. A DDI was a signal from the IRS that it had received the return and had no information that would preclude direct deposit of the taxpayer's refund into the designated account. However, on October 26, 1994, Treasury Secretary Lloyd Bentsen announced efforts by the IRS to detect fraud in tax returns filed electronically and those claiming an earned income tax credit ("EITC"). (R.67, Block's 12M Statement Ex. A, Treasury News at 1.) One aspect of the fraud-detection program was discontinuation of DDIs. (*Id.* at 2.) Another aspect of the program was that the IRS would "delay refunds on *any* questionable returns with an invalid or missing taxpayer identification number." (*Id.* at 4 (emphasis in original).) The Commissioner of Internal Revenue, Margaret Milner Richardson, stated that the IRS would increase the number of returns examined for fraud, including returns claiming an EITC. (*Id.* at 6.) Finally, Commissioner Richardson stated: "While we remain committed to issu[ing] refund checks timely on returns filed with complete and accurate information, refunds on returns with incorrect or missing social security number[s] will be delayed until we can verify that the taxpayer is due the refund." (*Id.* at 7.)

On November 4, 1994, Block Tax officials met with Peggy Rule, IRS Electronic Filing Program Executive, in an effort to clarify the impact of the IRS's fraud detection efforts on Block's customers. (R. 72, Peterson's Response to Block's Statement of Facts, at ¶ 13.) At the meeting the IRS candidly refused to provide Block with sufficient information to make an informed decision on what to tell customers claiming an EITC. The IRS did say that "most electronically-filed returns with EITC claims would be processed within 21 days unless they were 'problematic.'" (*Id.*) But the IRS refused to define "problematic." (*Id.*)

On December 28, 1994, the IRS posted "Fact Sheet FS–94–10" on its Electronic Filing Systems Bulletin Board outlining the fraud-prevention strategies for the 1995 tax season.[2] (R. 67, Block's 12M Statement Ex. C.) Because Peterson relies heavily on FS–94–10 to establish Block's intent, we quote extensively from it:

During Fiscal Year 1995, the IRS is emphasizing the importance of using correct taxpayer identification numbers (TINs) on tax returns, and of providing complete and accurate information when claiming refundable credits, such as the Earned Income Tax Credit and motor fuel credits.

The IRS has enhanced its processing systems to detect signs of possible noncompliance—intentional or unintentional—earlier and faster. These signs include missing, invalid, or duplicate TINs and the claiming of refundable credits in unusual circumstances. The IRS is committed to ensuring that people who are entitled to the EITC receive it. It is equally determined that ineligible taxpayers and fraud perpetrators do not take advantage of this and other refundable credits.

The additional scrutiny given to these tax returns may result in delayed refunds even for some taxpayers who have filed complete and accurate returns. In some cases, taxpayers will receive their refunds

---

*by, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**2.** The 1995 tax season ran from January 3 through April 30, 1995. (R.72, Peterson's Re-

sponse App. A, Block 10K Report for the Year Ending April 30, 1995, at *8.) Returns filed during this period were for tax year 1994.

in two installments to ensure that federal revenues are properly protected.

(*Id.* at 3.) Later, in the "Question and Answer" section of FS–94–10, the IRS states

We are not delaying all EITC refunds—some taxpayers claiming the credit may encounter delays. We're selecting returns based on our experience with questionable refunds. Just as we don't reveal exactly how we select returns for audit, we're not going to reveal exactly how we determine which EITC claims to review.

(*Id.* at 4, question no. 2.) In the same section, the IRS declares that "[t]he vast majority of taxpayers will get their money in the usual time if they provide us accurate and complete information," (*id.* at 5, question no. 6), but that "[s]ome perfectly correct returns may be temporarily caught up by the screens and filters we're using to catch questionable returns," (*id.*, question no. 7). Finally, FS–94–10 reports that

[t]he IRS is rev.:ewing every returns [sic] that is filed. All returns are run against our criteria. The screens we are using are based on what we've learned from our fraud control efforts in recent years. We can't discuss the specifics about our reviews, since this could give those attempting fraud a roadmap for avoiding our checkpoints.

(*Id.* at 6, question no. 8.)

At about the same time FS–94–10 was released, Block Tax officials met a second time with the IRS. Again, the IRS refused to say how many refunds would be delayed due to the increased scrutiny of EITC returns, stating "only that the number would be somewhere between a few and a million." (R. 72, Peterson's Response, at ¶ 17.)

After the IRS announced the elimination of DDIs, several banks that had previously offered RALs to Block's customers decided not to do so. In fact, Beneficial National Bank ("Beneficial") was the only lending institution that would continue to make RALs. Beneficial, however, decided it too would screen RAL applications more stringently when deciding whether to authorize a loan.

Based on the foregoing information, Judy Keisling, Vice President of Operations Systems for Block Tax, created an "RAL Fact Sheet" for RAL applicants. (R. 67, Block's 12M Statement Ex. E [hereinafter "December Fact Sheet"].) The December Fact Sheet first describes the changes instituted by the IRS:

The IRS has made a change and will no longer tell the bank if your refund can be used to pay off your loan. In some cases the banks are limiting loans because of this new IRS policy. **H & R BLOCK MUST FILE YOUR RETURN WITH THE IRS** before the bank will tell us whether you will receive all of your money in a few days, only part of your money in a few days, or whether you will have to wait 3 weeks to get any of your money.

(*Id.*) The three possible outcomes were not options available for RAL applicants to chose from; rather, they were three possible outcomes based on whether Beneficial decided to grant the RAL application, grant the application in part, or deny the application. If the RAL was granted, Beneficial agreed to a loan in the full amount of the claimed refund. In the case of a partial RAL, Beneficial agreed to a loan against only part of the claimed refund (the "first check" available within three days of filing) and would then forward the balance when the IRS deposited the refund into the account, presumably within 21 days of filing. Finally, if the RAL was denied, the applicant would receive their refund once the IRS had deposited it in their account.

The December Fact Sheet then provides three squares in which the tax preparer calculates the fees and check amounts under each of the bank's options. Each "calculation square" states that the final payment would occur "in 3 weeks." Finally, the sheet instructs customers how to obtain information on the status of their loan application and states that "[t]he amount you receive in 3 weeks will be based on the IRS refund actually deposited at the lender bank." Prior to its distribution and use, the December Fact Sheet was reviewed by H & R Block management,[3] as were all subsequently prepared

---

3. It is unclear whether the "H & R Block" in this allegation refers to Block Tax or its parent com-

fact sheets. (R. 74, Block's Reply ¶ 5.) Block deliberately decided not to include a warning that EITC refunds might be delayed. (*Id.* at ¶ 6.)

On January 4, five days after Keisling created the December Fact Sheet, Beneficial, responding to rumours, informed Block that it would not make loans against the EITC portion of any refund claimed by male taxpayers filing as head of household. Block adjusted its procedures in accordance with this information.[4]

Block began submitting electronically-filed 1994 tax returns on January 13. On January 27, Beneficial received the first IRS refund payments for direct deposit into RAL-customer accounts. Beneficial analyzed the payments and found no specific pattern of denied or delayed refund payments on the electronically-filed returns. Just before Beneficial received the first IRS payment, on January 24, Keisling revised the RAL Fact Sheet by adding the following notice: "If your return includes an earned income tax credit, the bank may reduce the amount you receive by the amount of earned income credit."[5] (R. 67, Block's 12M Statement Ex. H [hereinafter "January Fact Sheet"].)

On February 3, Beneficial received the second IRS refund payment. In stark contrast to the first payment, analysis revealed that the IRS appeared to be withholding all EITC portions of the refund payments. On February 4, Beneficial informed Block that, effective immediately, no RALs would be made against the EITC portion of taxpayer refunds. Essentially, this meant that taxpayers could receive a loan in the amount of their claimed refund minus the EITC; once the IRS calculated the appropriate refund and transferred the funds to Beneficial, Ben-

eficial would forward the balance to the taxpayer.

Keisling again revised the RAL Fact Sheet in response to this new information. (R. 67, Block's 12M Statement Ex. I [hereinafter "February Fact Sheet"].) In addition to stating that customers could not receive a loan on any EITC portion of a refund, the February Fact Sheet stated:

**H & R BLOCK MUST FILE YOUR RETURN WITH THE IRS** before the bank will tell us whether you will receive any part of your money in a few days, or whether you will have to wait 3–4 weeks to get any of your money. The amount you receive in 3–4 weeks will be the amount the IRS actually deposits at the lender bank. The IRS may delay paying any Earned Income Tax Credit claimed on your return for up to 8 or more weeks.

(emphasis in the original.) Furthermore, Keisling added a line among the calculation squares explicitly excepting any claimed EITC from the calculated check amounts.

In its Form 10K Report to the SEC, (R.72, Peterson's 12N Statement App. A ["10K Report"]), and its annual report to stockholders, (*id.* App. B ["Annual Report"]), H & R Block Inc. ("Block Inc.")—Block Tax's parent company—reported on the fallout of the "tax season from hell." Block Tax had approximately one million fewer customers in fiscal year 1995 than in fiscal year 1994.[6] Additionally, Block Tax's 1995 revenues decreased 3.4% from those of 1994. (Annual Report at *13.) Block Inc. attributed these declines to the changes implemented by the IRS, specifically, those resulting in the uncertainty surrounding RALs. (10K Report at *7; Annual Report at *12.)

---

pany, H & R Block Inc.

**4.** Block claims that at about this time it amended its training materials and instructed tax preparers, among other things, to inform customers that the IRS had changed its procedures and that "[n]o one knows how fast you'll receive your money." Peterson admits that the training materials were amended, but denies that the materials were distributed to all tax preparers. Block responds that the materials were distributed to trainers who verbally instructed the preparers. The record contains no evidence that tax prepar-

ers were trained consistently with the amended materials. Therefore, this court will not consider these amended procedures.

**5.** Block does not explain why this revision was made.

**6.** Specifically, Block Inc. reported that in FY1995 Block Tax served 17,060,000 taxpayers worldwide, down from 18,107,000 in FY1994. (R. 72, Peterson's 12N App. A, 10K Report at *7.)

## B. Peterson's Experience During the 1995 Tax Season

On January 31, 1995, Peterson went to Block for tax-preparation services. She had used the Rapid Refund program before, and liked the fact that she could depend on receiving her refund within three days of filing her return. Therefore she requested Block's Rapid Refund services in 1995 as well. Specifically, she asked Block to prepare her tax return, electronically file the return, and assist in applying for an RAL.

Peterson's tax preparer was Karen Nugent. Peterson claimed an EITC in the amount of $2,231 on her return. She also claimed a refund of $705 that was withheld from her pay checks. Thus Peterson claimed a refund in the amount of $2,936. Peterson does not allege any error in the preparation of her tax return.

During their meeting, Nugent explained the IRS changes to Peterson, but told her that she (Nugent) did not believe the changes would affect the timeliness of her refund because she was not a man filing as head of household. (R. 72, Peterson's 12N Statement at ¶ 49.) Nugent filled out a January RAL Fact Sheet for Peterson. Peterson's fact sheet included the warning that Beneficial might withhold the EITC portion of her refund and the following calculations: if Beneficial granted the RAL application in full, Peterson would pay $155.50 in fees (including the tax-preparation and electronic-filing fees), and receive a check for $2,780.50 within three days; if Beneficial granted the application in part, the fees would be $100.50, the first check would be for $399.50 and the second check would be for $2,436.00; and if

Beneficial denied her application, the fees would amount to $51.50 and she would receive a check for $2,884.50.[7] (R. 72, Peterson's 12N Statement App. G, Peterson Dep. Ex. No. 5.) Based on the information Block had regarding Beneficial's RAL lending procedures, Nugent told Peterson that she would probably qualify for a partial RAL, (R. 72, Peterson's 12N Statement at ¶ 55), that her RAL check should be available in about three days, (id. at ¶ 49), and that she would receive the rest of her refund within three weeks, (id. at ¶ 55).[8]

Block filed Peterson's tax return with the IRS and forwarded her RAL application to Beneficial on January 31. Beneficial approved a partial RAL, and Peterson received her RAL check on February 2. On February 10, the IRS deposited the non-EITC portion of Peterson's refund into her account at Beneficial. Soon after, Peterson received a letter from the IRS informing her that the EITC portion of her refund would be delayed for up to eight weeks. (R. 72, Peterson's 12N Statement App. G, Peterson Dep.Ex. No. 6.) Peterson estimates that she received the balance of her refund twelve weeks after filing her income tax return.

## C. The Procedural History of this Lawsuit

Peterson filed suit against Block in the Circuit Court of Cook County, Illinois. Peterson's complaint, based on the circumstances related above, presented four claims arising under state law: breach of contract to provide accurate tax advice and the implied covenant of good faith and fair dealing; violation of the Illinois Consumer Fraud and De-

---

7. Although neither party parses the fee amount, we note that Block's bill is attached to Peterson's 1994 tax return. The bill indicates that the fee for electronic filing was $25.00 and the tax preparation fee was $41.50, totaling $66.50. (R. 72, Peterson's 12N Statement App. F, Peterson Dep. Ex. No. 3.) Thus it appears as though Beneficial charged $89.00 when it made an RAL and $34.00 when it made a partial RAL. The reason that the fee for an RAL denial is less than $66.50 is that, under this circumstance, Block waived the $25.00 electronic filing fee and instead charged a $10.00 processing fee. Of course, Beneficial charged no fee when it denied an RAL application. (R. 67, Block 12M Statement Ex. F, New Options Brochure at 2.)

Based on these calculations, we note that the factual basis for Peterson's statement that she would never have paid $100.50 to get a $399.50 loan is inaccurate. Peterson paid $100.50 for the entire package: tax preparation, electronic filing, and the RAL. Only $34 of the $100.50 went to obtaining the $399.50 loan. This court believes, however, that whether Peterson would have paid $34 to get $399 is irrelevant to the question whether Block participated in a scheme to defraud Peterson.

8. The parties strenuously dispute whether Nugent told Peterson that her check could be delayed and that "nothing is etched in stone."

ceptive Practices Act; breach of fiduciary duty; and restitution. Peterson also advanced two claims under RICO, 18 U.S.C. § 1962(c). Specifically, Peterson alleged that Block (Count II) and ten unnamed Block officers (Count III) participated in the operation or management of an enterprise through a pattern of mail fraud.

Block removed the case to federal court under 28 U.S.C. § 1441(b), and this Court took supplemental jurisdiction of Peterson's state law claims pursuant to 28 U.S.C. § 1367(a). On Block's motion, we previously dismissed Peterson's fiduciary duty claim, but found that she had stated a claim for breach of contract. *Peterson,* 971 F.Supp. at 1215. Additionally, we granted Peterson's motion for class certification. *Peterson,* 174 F.R.D. at 87.

Block now seeks summary judgment on Peterson's remaining claims arguing, among other things, that Peterson cannot establish a triable issue regarding any one of the elements of her RICO claims. Although some of Block's arguments are faulty, we conclude that Block is entitled to summary judgment on Peterson's RICO claims because she has not pointed to evidence showing two elements of her case. We then turn to Peterson's supplemental state law claims. Because Peterson's federal claims have been dismissed and because her supplemental claims raise complex issues of proof under Illinois law, we decline to exercise our discretionary jurisdiction over her state law claims and remand those claims to state court.

## SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate only if no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In deciding Block's motion for summary judgment this court considers the evidence in the light most favorable to Peterson and makes all justifiable inferences in her favor. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 255, 106

S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, "only those inferences that are reasonable and present a sufficient disagreement to require submission to a jury" will preclude summary judgment. *Richards v. Combined Ins. Co. of Am.,* 55 F.3d 247, 251 (7th Cir. 1995). Thus Peterson must do more than show some metaphysical doubt as to the facts of this case; she must point to evidence establishing a genuine need for trial. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## ANALYSIS

### A. Peterson's RICO claims

■ To establish civil liability for a RICO violation, Peterson must show that Block (1) conducted (2) an enterprise through (3) a pattern (4) of racketeering activity. *See, e.g., Reves v. Ernst & Young,* 507 U.S. 170, 178, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993); *Goren v. New Vision Int'l, Inc.,* 156 F.3d 721, 727 (7th Cir.1998); *Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.,* 63 F.3d 516, 522 (7th Cir.1995); 18 U.S.C. §§ 1964(a), 1962(c). Although Block attacks Peterson's ability to show a triable issue on any one of the four RICO elements, we focus on Block's challenge to the sufficiency of Peterson's evidentiary submissions regarding the third and fourth elements; namely, whether Block engaged in a pattern of racketeering activity.

#### 1. Evidence that Block Engaged in Racketeering Activity

■ Congress defined "racketeering activity" by reference to a long list of statutory provisions that, when violated, constitute racketeering. 18 U.S.C. § 1961(1)(B). Among the enumerated provisions—and the one upon which Peterson relies—is the federal mail fraud statute.[9] 18 U.S.C. § 1341. A showing of mail fraud requires Peterson to produce evidence from which a jury could reasonably conclude that Block engaged in a scheme to defraud customers.[10] Peterson

---

**9.** In her complaint, Peterson relied on both mail and wire fraud to plead racketeering. But in her response to Block's summary judgment motion she argues only mail fraud.

**10.** Of course, the fraud must be perpetrated using the mails, but neither party discusses this aspect of Peterson's case. Therefore, we assume she can meet her burden to produce evidence satisfying this element of mail fraud.

maintains that Block defrauded its EITC customers by lying to them about their eligibility for RALs. Section 1341, however, punishes only deliberate fraud. *Emery v. American Gen. Fin., Inc.,* 71 F.3d 1343, 1346 (7th Cir.1995); *Richards,* 55 F.3d at 252. Thus, Peterson must produce evidence that Block intended to cheat its customers out of additional, unwarranted fees. Specifically, she must point to evidence that Block knew its EITC customers would not receive the EITC portion of their refunds within the three weeks indicated on the January RAL Fact Sheet. To accomplish this goal, Peterson relies on two general categories of evidence: she first points to the information released by the IRS between October 1994 and January 1995, then she turns to evidence of the financial impact of RALs on Block Tax in fiscal years 1994 and 1995.

Before discussing Peterson's evidence, we must address the status of the Doe defendants. At this stage of the litigation, Doe defendants are inappropriate. Discovery was completed months ago and the mere identification of unnamed defendants does not preserve relation back under Federal Rule of Civil Procedure 15. *See Wudtke v. Davel,* 128 F.3d 1057, 1060 (7th Cir.1997). Of primary importance, though, is the impossibility of producing evidence of the state of mind of a fictitious defendant. *See KFP v. Dane County,* 110 F.3d 516, 519 (7th Cir. 1997). For these reasons, this Court sua sponte dismisses the ten unnamed defendants.

Regarding the first category of evidence purportedly establishing Block's intent to defraud, Peterson points to IRS statements typified by the following: "[t]he additional scrutiny ... may result in delayed refunds even for some taxpayers who have filed complete and accurate returns," contained in FS–94–10;[11] and "up to a million" taxpayers would be affected by the fraud detection program. She also relies on testimony regarding Block's reaction to the IRS changes. She highlights Keisling's statement that

Block officials deliberately did not include a warning that EITC refunds could take longer than three weeks, and Buckley's statement that Block knew there was a possibility of delayed refunds. Peterson contends that a reasonable jury could conclude, based on these and similar statements, that Block knew customers claiming EITCs would be ineligible for the benefits of its RAL service; namely, getting the full amount of their refund within three weeks.

This evidence fails to satisfy Peterson's burden. First, the individual statements relied upon by Peterson are taken completely out of context and, in any event, do not support an inference of intentional fraud. For example, the IRS made the "up to a million" statement in the context of refusing to define the impact of its fraud-prevention strategies on Block's customers. The statement in its entirety reads as follows: "the number [of people affected by the fraud-detection program] would be somewhere between a few and a million." This statement was no better than telling Block to guess, and certainly did not put Block on notice that all, or even many, taxpayers claiming EITCs would suffer delays in receiving their refunds.

Similarly, the "may result in delays" statement implies that, at least in terms of "accurate and complete" returns, delay would be the exception rather than the norm. In fact, each time the IRS made this sort of statement—in the October 26 press release, FS–94–10, and on Form 1040—it was in the context of apologizing to those "accurate and complete" filers whose return inadvertently got caught in the IRS's fraud filters. For example, the October 26 release emphasized delay of returns with incorrect or missing TINs, but assured the public that the IRS "remain[s] committed to issue refund checks timely on returns filed with complete and accurate information." Similarly, on Form 1040, the warning of delay is contained in a footnote to the following statement: "If you file a complete and accurate return, your refund will be issued within 21 days."

11. Similar statements appear in both Form 1040 and the IRS's October 26 announcement. The section of Form 1040 describing the advantages of electronic filing states that "Some refunds may be temporarily delayed as a result of compliance reviews to ensure that the returns are accurate." (R. 67, Block's 12M Statement Ex. B, Form 1040 at 5.)

Reading the IRS statements in context, it is clear that Peterson has established nothing more than that the IRS refused to disclose it's fraud-detection strategy and, in fact, drastically downplayed the impact of that program on the timeliness of refunds. A jury could not reasonably infer from this evidence that Block knew its EITC customers would have to wait more than three weeks for the EITC portion of their tax refunds.

Peterson's reliance on the Keisling and Buckley statements is similarly misplaced. When Buckley admitted knowing that some delays were possible, he was referring to the possibility that an additional one or two percent of Block's customer's might suffer actual delays in getting their refunds. (R. 72, Peterson's 12N Statement App. D, Buckley Dep. at 86.) Contrary to Peterson's unsupported allegation that Block knew substantial delays would occur, (R. 71, Mem. in Opp. at 5), Keisling and Buckley consistently testified that they did not know what the impact of the IRS changes would be, but believed it would not be substantial. Peterson cannot rely on the testimony of Block officials to establish intent to defraud.

Furthermore, that Block deliberately excluded a warning from the January RAL Fact Sheet is insufficient to establish fraudulent intent. There are hundreds of reasons, both legitimate and forbidden, that a business might exclude a warning from a document: the fact that the exclusion is deliberate (as opposed to negligent) says nothing about the motivation behind the decision to exclude.

Even if the statements referred to by Peterson provide some faint glimmer of support for her claims, other IRS statements flatly contradict any inference that Block knew, before February 4, 1995, that Peterson and other EITC taxpayers would not receive the EITC portion of their refunds within three weeks. IRS bulletin FS–94–10 brazenly declared that "[w]e [i.e. the IRS] are not delaying all EITC refunds" and that "the vast majority of taxpayers will get their money in the usual time [i.e. within three weeks]." As subsequently became clear, the IRS changed its position and in fact did delay all EITC refunds. But the IRS's pre-February pronouncements and Block's reactions do not support an inference that before February 4 Block knew this would happen.

Finally, the evidence establishes that the first IRS payment to Beneficial, made January 27, 1995, showed no pattern of withholding EITC refunds. Additionally, Block amended its RAL Fact Sheet on February 4, 1995—the day after the second IRS deposit, which demonstrated the EITC-withholding pattern, and the day that Beneficial informed Block that it would no longer make loans against EITC portions of refunds. This evidence, the sequence of IRS payments and Block's reaction, considered in light of the evasive and conciliatory IRS statements discussed above, overwhelmingly negates any possible inference that Block intended to defraud its EITC customers.

The second evidentiary category consists of the 10K Report and the Annual Report. The two reports relate the dramatic decrease in customers and revenues in 1995, which Block attributed to the loss of RAL-based business resulting from the IRS's fraud detection strategies. She claims that the "RAL program was critical to Block's financial well-being," Block knew it, and a reasonable jury could conclude, based on this knowledge, that Block intentionally attempted to minimize its losses by misleading customers.

We do not understand how evidence that Block lost money as a result of the IRS changes supports an inference that Block intentionally lied about those changes in order to avoid losing money: presumably, if Block had lied to customers in order to collect unwarranted fees, it would not have lost money. Similarly, the bald fact that in 1994 Block Tax reaped substantial earnings from RAL services does not translate into an inference that Block later lied to customers so as to maintain those earnings. It simply does not follow that whenever a business knows that it will lose money due to a regulatory change that the business will respond by committing fraud. At best, this evidence is weak proof of a financial motive to commit fraud, but does not by itself or in combination with the other evidence create a material

issue of fact as to the mail fraud element necessary to establish a RICO violation.

Peterson also relies on evidence that, in fiscal year 1994, Block Financial Corporation, a sister subsidiary of Block Tax, earned almost twenty-five million dollars by investing in RALs, most of which originated with Block Tax. (R. 72, Peterson's 12N Statement App. B, Annual Report at *17.) In fiscal year 1995, Block Financial did not invest in RALs because the IRS discontinued DDIs and therefore Block Financial believed the risk was too great. (*Id.*) Again, this evidence is irrelevant to the issue of Block Tax's intent to defraud. Whether or not Block Tax intentionally lied to EITC customers, DDIs were eliminated and accordingly the risk of investing in RALs increased. Block Financial therefore invested elsewhere. This set of facts simply has no bearing on whether Block Tax lied to its customers. Had Block Financial continued to invest in RALs despite the increased risk perhaps an inference of fraudulent intent could be inferred; as the record stands, it cannot.

In sum, Peterson has not produced evidence from which a jury could reasonably find that Block intended to defraud its EITC customers. Thus, Peterson cannot establish that Block engaged in mail fraud, the racketeering activity underlying her RICO claim.

### 2. Evidence of a Pattern of Racketeering

■ Even if Peterson could prove that Block engaged in mail fraud (and therefore in a racketeering activity), she must also demonstrate a pattern of racketeering. "Pattern" as used in RICO is shorthand for the relatedness and continuity of the racketeering activity. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Assuming that Block's alleged acts of mail fraud are related, Peterson must show that they amounted to, or otherwise constitute a threat of, continuing criminal activity. *H.J. Inc.*, 492 U.S. at 240, 109 S.Ct. 2893; *Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.*, 63 F.3d 516, 523 (7th Cir.1995); *Vicom, Inc. v. Harbridge Merchant Serv., Inc.*, 20 F.3d 771, 779 (7th Cir.1994). She can do this by showing either "a closed period of repeated conduct, or ...

past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241, 109 S.Ct. 2893.

■ "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *Id.* 492 U.S. at 242, 109 S.Ct. 2893. But fraudulent acts "extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *Id.* When analyzing the existence of a closed period of continuity, we also consider the number and variety of predicate acts, the number of victims, the presence of separate schemes, and the occurrence of distinct injuries. *Uniroyal Goodrich*, 63 F.3d at 524; *Vicom*, 20 F.3d at 780.

■ Although the parties disagree over the duration of Block's alleged fraudulent conduct, we assume in accordance with the summary judgment standard that the alleged fraud began on October 26, 1994—the earliest possible date that Block could have known that EITC customers would not receive their refunds within three weeks of filing their returns—and ended on February 4, 1995—the day Block began informing EITC customers that they were ineligible for RALs on the EITC portion of their refunds. Thus, the alleged scheme spanned a period of approximately thirteen weeks.

Thirteen weeks is not a "substantial period of time." *See Vicom*, 20 F.3d at 780–81 (a period of nine months does not satisfy the durational requirement of closed-ended continuity); *id.* (cataloguing cases regarding the durational requirement). Turning to the remaining factors, there is no evidence that Block engaged in a variety of predicate acts, *compare id.* 20 F.3d at 781, or even concocted more than one scheme to defraud. Although the evidence could support a conclusion that there were more than 14,000 victims of the alleged scheme, this standing alone does not establish continuity given the extremely short time frame. *Compare id.* 20 F.3d at 781–82. Peterson has not established a genuine issue on the existence of a closed-ended pattern of racketeering.

■ Because Peterson is unable to establish closed-ended continuity, she must establish open-ended continuity by showing:

(1) a specific threat of repetition exists, (2) the predicates are a regular way of conducting an ongoing legitimate business, or (3) the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes.

*Vicom,* 20 F.3d at 782. Peterson argues only that a threat of future repetition exists because "Block is still engaged in the business at issue[, and it] can still offer its Rapid Refund service to individuals who cannot benefit from it." (R. 71, Mot. in Opp. at 10.) She also notes that the economic incentive to lie remains, and that "it is an easy matter to create [ ] documents that mislead taxpayers into buying services from Block." (*Id.*)

■ Peterson's arguments regarding open-ended continuity are not supported by the record. The fraudulent scheme she complains about came to an end on February 4, 1995. Thus, there is no possibility of continuity. *See Vicom,* 20 F.3d at 782 ("[S]chemes which have a clear and terminable goal have a natural ending point. Such schemes therefore cannot support a finding of any specific threat of continuity that would constitute open-ended continuity.") In any event, her claim that Block could easily create fraudulent documents and might do so because economic incentives exist to commit fraud is not only speculative but also applies to every company in existence. The fact that Block could participate in some hypothetical fraudulent scheme at some unidentified time in the future simply does not constitute a *specific* threat. *See Olive Can Co., Inc. v. Martin,* 906 F.2d 1147, 1151 (7th Cir.1990) ("This single scheme was to be short-lived and there is no evidence that, had the scheme worked, it would have been repeated in the future.").

In conclusion, Peterson has not produced evidence showing a triable issue whether Block engaged in a pattern of mail fraud. Additionally, she has not established a genuine issue that Block intended to defraud its customers, and therefore she did not show that Block participated in a racketeering activity. Because Peterson failed to meet her burden on two essential elements of her

RICO claim, this court grants judgment in favor of Block.[12]

## B. Peterson's State Law Claims

■ Peterson's remaining claims are based in state law. Having determined that Block is entitled to summary judgment on Peterson's RICO claims, thereby resolving Peterson's only federal claims, we decline to exercise our supplemental (and discretionary) jurisdiction over the remaining claims. *See* 28 U.S.C. § 1367(c) ("[D]istrict courts may decline to exercise supplemental jurisdiction ... if ... (3) the district court has dismissed all claims over which it has original jurisdiction.") We believe the state courts are far better situated to untangle the difficult mens rea requirements among the remaining state causes of action asserted by Peterson, as well as whether the evidence is sufficient to establish the appropriate states of mind.

### CONCLUSION

For the reasons stated above, we grant Block's motion for summary judgment on Peterson's RICO claims. Additionally, pursuant to 28 U.S.C. § 1447(c) we remand Peterson's remaining state law claims to state court.

---

**12.** Given this conclusion, we need not address     Block's remaining arguments.