13-2514
Crawford v. Franklin Credit Management Corp.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2013

(Argued:  April 7, 2014                                        Decided:  July 11, 2014)

Docket No. 13-2514

_____

LINDA D. CRAWFORD,

Plaintiff-Counterclaim-Defendant-Appellant,

- v. -

FRANKLIN CREDIT MANAGEMENT CORPORATION, TRIBECA LENDING CORPORATION,

Defendants-Counterclaimants-Cross-Claimants-Appellees,

LENDERS FIRST CHOICE AGENCY, INC.,

Defendant-Crossclaim-Defendant-Appellee.[*]
_____

Before:  KEARSE, JACOBS, and LYNCH, Circuit Judges.

        Appeal from a judgment of the United States District Court for the Southern District of New York, John F. Keenan, Judge, dismissing plaintiff's claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq., the Equal Credit Opportunity Act, 15 U.S.C.

---

[*]    The Clerk of Court is directed to amend the official caption to conform with the above.

§§ 1691 et seq., the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 et seq., the New York General Business Law, N.Y. Gen. Bus. Law § 349, and common law. Because plaintiff had not disclosed her present claims in a 2006 bankruptcy case, the district court granted summary judgment dismissing the amended complaint against the served defendants on grounds of lack of standing or collateral estoppel. See 2011 WL 1118584 (Mar. 23, 2011).

Affirmed in part, vacated in part, and remanded. We vacate so much of the judgment as dismissed plaintiff's claims against the served defendants for common-law fraud and violation of TILA; we affirm the dismissal of the remaining claims on the ground that plaintiff failed to adduce evidence of genuine issues of material fact for trial.

> CHITTUR & ASSOCIATES, Ossining, New York (Krishnan S. Chittur, of counsel), submitted a brief for Plaintiff-Counterclaim-Defendant-Appellant.

> MARTIN C. BRYCE, JR., Philadelphia, Pennsylvania (Ballard Spahr, Philadelphia, Pennsylvania, on the brief), for Defendants-Counterclaimants-Cross-Claimants-Appellees.

KEARSE, Circuit Judge:

Plaintiff Linda D. Crawford appeals from a judgment of the United States District Court for the Southern District of New York, John F. Keenan, Judge, dismissing her amended complaint ("Complaint") which alleged that defendants fraudulently procured a mortgage on her home, and thereafter sought to foreclose on that mortgage, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq., the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691 et seq., the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 et

2

seq., the New York General Business Law, N.Y. Gen. Bus. Law § 349, and common law. The district court denied a motion by Crawford for partial summary judgment on the issues of liability. The court granted the motions of defendants Franklin Credit Management Corporation ("Franklin") and Tribeca Lending Corporation ("Tribeca") for summary judgment dismissing the claims against them, ruling that, because Crawford had failed to disclose these claims in a 2006 proceeding under Chapter 13 of the Bankruptcy Code ("Code"), her present suit was barred for lack of standing or by collateral estoppel. The court noted that defendant Lenders First Choice Agency, Inc. ("Lenders First Choice"), had not been served and did not appear in the action. On appeal, Crawford makes no argument with respect to the dismissal of Lenders First Choice. She principally challenges the district court's standing and estoppel rulings in favor of Franklin and Tribeca (or "Defendants") and its denial of her motion for partial summary judgment against them.

For the reasons that follow, we affirm the denial of Crawford's motion for partial summary judgment in her favor; we vacate so much of the judgment as dismissed Crawford's TILA and common-law fraud claims against Franklin and Tribeca and remand for further proceedings on those claims; we affirm the dismissal of Crawford's other claims because, as to each, she failed to adduce evidence sufficient to show a genuine issue of material fact to be tried.

3

# I. BACKGROUND

Except as indicated below, the following facts, taken largely from the parties' respective statements pursuant to Rule 56.1 of the Local Rules for the Southern District ("Rule 56.1"), are not in dispute.

A. Events in November and December 2004

In 2000, Crawford, a registered nurse and longtime flight attendant, bought a home at 40 Paradise Avenue in Piermont, New York ("40 Paradise"). The purchase was funded with a mortgage loan from Community Home Mortgage Corporation ("Community"); Crawford later took out a line of credit from Chase Bank, secured by a second mortgage on 40 Paradise. In 2003, Crawford enrolled as a full-time student in medical school in the Dominican Republic. Although she also continued to work to some extent as a flight attendant and a nurse, by November 2004 she was in default on her debts to Community and Chase Bank. The total balance on those two loans was approximately $400,000, and a foreclosure action on 40 Paradise was commenced by Community.

At the times relevant to this action, Tribeca was a lending company and a wholly owned subsidiary of Franklin. Franklin maintains that it merely serviced loans originated and retained by Tribeca but did not itself make loans. Crawford attributes the allegedly fraudulent mortgage transaction to both Tribeca and Franklin, based in part on documents produced by Defendants.

In November 2004, Tribeca employee Robert Koller telephoned Crawford to discuss the possibility of her obtaining a loan from Tribeca. The two never met, but they had several such telephone conversations, the contents of which are in dispute.

4

Crawford's version is that Koller said Franklin and Tribeca were "foreclosure rescuers" and offered to refinance her home. (Plaintiff's Statement of Undisputed Facts Under Local Rule 56.1 In Support of Plaintiff's Cross-Motion For Summary Judgment With Respect To Liability of Defendants Franklin Credit and Tribeca Lending ("Crawford's Rule 56.1 Statement") ¶ 10.) Crawford told Koller that, because of her full-time-student status and reduced work with the airline, she could not afford to make any monthly payments on a mortgage for at least a year; Koller said he would "tailor" for Crawford a one-year "bridge loan" of $35,000, and that Tribeca would take care of her monthly payments to her mortgagees and stave off foreclosure for a year; thereafter that loan would be converted to a 30-year fixed-rate mortgage loan. (Id. ¶¶ 11-13 (internal quotation marks omitted).) Koller urged Crawford to act on Tribeca's offer promptly, telling her that since Crawford was an African-American, Community would foreclose very quickly. (See id. ¶ 14.)

According to Crawford, Koller thereafter told her that papers she had submitted were insufficient to show her signature and that he would arrange for someone to meet her at JFK airport, when she was available between flights, so that she could provide "specimen signatures." (Id. ¶ 21 (internal quotation marks omitted).) As support for her Rule 56.1 assertions, Crawford principally cited her own deposition testimony, along with the allegations in her Complaint, which she had expressly adopted and incorporated by reference in a declaration (see Declaration of Linda Crawford dated July 9, 2010 ("Crawford Decl."), ¶ 2) submitted "under penalties of perjury."

In opposition to Crawford's motion, Franklin and Tribeca submitted, inter alia, a declaration from Koller stating that "[s]everal of the statements" in Crawford's Rule 56.1 Statement were "not true." (Declaration of Robert Koller dated August 13, 2010 ("Koller Decl."), ¶ 4.) Koller, who stated that he had been employed by Tribeca as a loan officer from February 2004 to June 2005,

5

denied telling Crawford that he or Tribeca was a "foreclosure rescuer" and denied that he ever offered her a "bridge loan" or used that term. (Id. ¶¶ 1, 5-6 (internal quotation marks omitted).) Instead, Koller stated that he told Crawford, and always believed she understood, that the loan from Tribeca would result in a mortgage on her property. (See id. ¶ 7.) Koller said he never told Crawford she would not have to make payments on her loan for a year, or that because she was an African-American her lenders would foreclose very quickly. (See id. ¶¶ 8-9.) He also denied telling her that papers she had submitted were deficient and denied that he arranged, or told her that he would arrange, for someone to meet her at the airport to obtain specimen signatures. (See id. ¶¶ 10-11.)

It is undisputed that on December 11, 2004, Crawford met someone at the airport for the purpose of providing her signature. Here too, however, there are divergent versions as to substance. Crawford stated that she met "Defendants' representative" and that she "signed some blank pages as requested by Defendants' representative." (Crawford's Rule 56.1 Statement ¶ 23.) She stated that she never requested a mortgage from Franklin or Tribeca but that they, without her knowledge, intent, or consent, "use[d her] signatures to manufacture a mortgage" on her home in the amount of $504,000 (id. ¶¶ 24-26, 28) (the "Tribeca Mortgage"). Crawford said she did not receive copies of any note or mortgage on December 11; she did not receive closing documents concerning the Tribeca Mortgage until June 2007. (See id. ¶ 35.)

Franklin and Tribeca submitted a declaration from Anthony Decarolis, an attorney, who stated that he met with Crawford at the airport on December 11, 2004 (see Declaration of Anthony Decarolis dated July 28, 2010 ("Decarolis Decl." or "Decarolis Declaration"), ¶¶ 1, 4-6); but Decarolis denied that he asked Crawford to sign any blank pages, saying "I have never requested, nor have I been asked to request, that a borrower sign blank pages" (id. ¶ 10). Rather, although Decarolis

6

said he has never been employed directly by Franklin or Tribeca and could not remember precisely who had first contacted him on this matter, he said he had been retained to handle the closing of Crawford's mortgage from Tribeca. (See id. ¶¶ 3-4.) That closing took place at JFK airport in Decarolis's car; no one other than Decarolis and Crawford was present. Decarolis stated that he described the closing documents to Crawford, and she reviewed them before signing them. He said his customary practice, like that of most lenders, was to request that the borrower sign multiple copies of documents, and to give the borrower copies at the closing. Decarolis said he had no reason to believe he deviated from these practices during the closing of Crawford's loan. (See id. ¶¶ 7-9.)

Of the proceeds from the $504,000 Tribeca Mortgage, a total of $459,102.62 was used to pay off Crawford's two existing mortgages; $1,400 was used to pay Crawford's outstanding property taxes; $35,050.86 was used to pay settlement charges on the loan; and $7,196.52 was disbursed to Crawford in cash. Crawford promptly complained to Koller that she had expected to receive $35,000. She asserts--and Koller denies--that he told her the "fees" were higher than expected. (Crawford's Rule 56.1 Statement ¶ 30 (internal quotation marks omitted); Koller Decl. ¶ 15.)

B. The Tribeca Foreclosure and Crawford's Bankruptcy Proceedings

By February 2005, Crawford was in default on the Tribeca loan. In September 2005, Tribeca commenced a foreclosure action on 40 Paradise in state court; in August 2006, the court entered a default judgment against Crawford. In October 2006, in order to forestall an imminent foreclosure sale, Crawford, through counsel, filed a petition for bankruptcy ("2006 Petition") under Chapter 13 of the Code (Crawford's "First Bankruptcy"). In her schedule of assets filed in connection

7

with the 2006 Petition, Crawford did not list any of the claims she asserts in the present case. Nor did she otherwise disclose these claims during that First Bankruptcy. The 2006 Petition was dismissed in April 2007 after Crawford failed to appear at the scheduled confirmation hearing for her plan for payment to creditors and failed to make payments that were called for in her proposed plan.

After a second bankruptcy filing by Crawford in June 2007 to prevent the foreclosure sale, and after other protracted proceedings in the state and federal courts delaying the sale, 40 Paradise was eventually sold in foreclosure in 2011.

C. Dismissal of the Present Action

Crawford commenced the present action in July 2008 asserting, to the extent pertinent to this appeal, claims under RICO, ECOA, TILA, and New York General Business Law ("GBL") § 349, as well as common-law claims of fraud and negligent misrepresentation. She sought damages, injunctive relief, and rescission of the Tribeca Mortgage. Franklin and Tribeca filed a joint answer to the Complaint, denying most of its allegations, and asserted, inter alia, counterclaims against Crawford seeking attorneys' fees for defense of the present action, and--if Crawford succeeded in having the Tribeca Mortgage rescinded--seeking restitution to Tribeca of the amounts it had paid to satisfy Crawford's prior mortgages with Community and Chase Bank.

Following discovery, Franklin and Tribeca moved for summary judgment. Tribeca argued, inter alia, that Crawford lacked standing to assert her claims, that several of her claims were time-barred, that her request for rescission was barred by the Rooker-Feldman doctrine and principles of res judicata, and that a number of her claims failed as a matter of law for lack of evidence to prove essential elements of those claims. In contending that Crawford lacked standing, Tribeca argued that

8

although Crawford in her First Bankruptcy petition and filings had failed to disclose her present claims, these claims had automatically become part of the bankruptcy estate upon the filing of the 2006 Petition and passed to the trustee, and that they remained part of the bankruptcy estate after the bankruptcy proceeding was dismissed. Tribeca suggested that only a bankruptcy trustee, not Crawford, would have standing to assert these claims.

Franklin joined Tribeca's arguments and added that Franklin was also entitled to summary judgment on the grounds that Koller was an employee of Tribeca, not Franklin, that Franklin was not a party to the loan and mortgage transaction, as the only lender was Tribeca, and that Franklin's status as Tribeca's corporate parent provided no basis for liability.

Crawford did not deny that she had failed to disclose her present claims in her 2006 bankruptcy; she argued instead that any claims that had belonged to her 2006 bankruptcy estate revested in her when the 2006 bankruptcy proceeding was dismissed. She also disputed the contention of Franklin that it was not a party to the loan or mortgage transactions--and indeed was not a lender at all--by pointing, inter alia, to evidence that the operations of Franklin and Tribeca were intermingled, to Franklin documents from November and December 2004 indicating Franklin's involvement in the approval of a loan to Crawford, and to a subsequent Franklin document related to her loan and titled "Franklin Credit Loan."

In addition, Crawford cross-moved for partial summary judgment in her favor on the issues of liability, arguing that Defendants had not sufficiently disputed her version of the 2004 events because, in response to her subpoenas pursuant to Fed. R. Civ. P. 30(b)(6) to take the depositions of Defendants' agents who could testify on their behalf, Defendants produced only witnesses who testified that they had no knowledge of the negotiations or interactions that preceded the Tribeca

9

Mortgage. She contended that Franklin and Tribeca should therefore be barred from relying on the declarations of Koller and Decarolis, citing the so-called sham-affidavit rule, i.e., the principle that a party's factual assertion in an affidavit opposing summary judgment, contradicting his prior deposition testimony, may be disregarded as a sham attempt to create an issue of fact. Crawford also asked the court to draw inferences adverse to Defendants--and to accept her factual assertions as true-- as sanctions for their conduct in discovery.

In an Opinion and Order dated March 23, 2011, the district court denied Crawford's motion for partial summary judgment in her favor on the issues of liability and granted the motions of Franklin and Tribeca for summary judgment dismissing the action. See Crawford v. Franklin Credit Management Corp., No. 08 Civ. 6293, 2011 WL 1118584 (S.D.N.Y. Mar. 23, 2011) ("Crawford I"). The court declined to draw the adverse inferences requested by Crawford, largely because "Plaintiff ha[d] not adequately shown that Defendants acted with culpable mental states . . . ." Id. at *8. Although Crawford argued that she was entitled to summary judgment as to liability because Defendants had not produced witnesses who could deny her version of the events, the court noted, inter alia, that Koller had not been a Franklin employee and was no longer employed by Tribeca and that Decarolis had never been employed by Tribeca. The court concluded that Crawford could not fault Defendants for no longer having an employee who had knowledge of the negotiations with her or for failing to produce Koller or Decarolis. The court pointed out that Crawford herself could have, but had not, subpoenaed Koller and Decarolis to take their depositions. See id.

The court granted the summary judgment motions of Franklin and Tribeca principally on standing grounds. See Crawford I, 2011 WL 1118584, at *14. As discussed more fully in Part II.A. below, the court concluded that Crawford's failure to disclose her claims in her 2006 bankruptcy

10

case barred her from asserting them in the present action. See id. at *13-*14. Alternatively, the court stated that as a result of that failure, Crawford's present claims were barred by collateral estoppel. See id. at *14.

Having decided the summary judgment motions, the district court inadvertently closed the case without dealing with Defendants' counterclaims. The case was eventually reopened; but it was stayed when the district court was informed that in November 2011 Crawford had commenced a third bankruptcy proceeding. In that proceeding, which was largely concluded in December 2012, the bankruptcy court granted Crawford a discharge from her debts, including those asserted in Defendants' counterclaims.

In 2013, Crawford moved in the district court pursuant to Fed. R. Civ. P. 60(b) for reconsideration of the Crawford I ruling that she lacked standing to pursue, or was estopped from pursuing, her present claims. In an Opinion and Order dated June 14, 2013, see Crawford v. Franklin Credit Management Corp., No. 08 Civ. 6293, 2013 WL 2951957 (S.D.N.Y. June 14, 2013) ("Crawford II"), the court denied the motion. After being informed that Defendants' counterclaims had been discharged by the bankruptcy court, the court entered final judgment. This appeal followed.

## II. DISCUSSION

On appeal, Crawford principally argues that the district court erred in ruling that she lacked standing to pursue her present claims and in denying her Rule 60(b) motion for reconsideration of that ruling. She also contends that the court erred in denying her motion for partial summary judgment, arguing (1) that, under the sham-affidavit rule, the court could not properly consider the Koller and Decarolis declarations, and (2) that it should have drawn adverse inferences against Defendants as sanctions for their conduct during discovery.

Crawford's arguments for partial summary judgment in her favor do not require extended discussion. As to the denial of her request that the district court draw factual inferences adverse to Defendants as discovery sanctions, we see no abuse of discretion, see, e.g., Lore v. City of Syracuse, 670 F.3d 127, 174-75 (2d Cir. 2012), and we affirm that denial substantially for the reasons stated by the court in Crawford I, 2011 WL 1118584, at *7-*9. As to Crawford's contention that the district court's consideration of the Koller and Decarolis declarations violated the sham-affidavit rule, we reject that contention because that rule has no application here. The principle is that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." Hayes v. New York City Department of Corrections, 84 F.3d 614, 619 (2d Cir. 1996). However, "where . . . testimony is contradicted by evidence other than the deponent's subsequent affidavit, . . . the concern that the proffered issue of fact is a mere 'sham' is alleviated." Palazzo ex rel. Delmage v. Corio, 232 F.3d 38, 43-44 (2d Cir. 2000). In this case there are two flaws in Crawford's argument. First, the deposition testimony on which Crawford relies was not given by

Koller or Decarolis; neither Koller nor Decarolis was deposed; and there is no indication in the record that either of them made any prior sworn statement which his declaration contradicts. Second, the statements in the Koller and Decarolis declarations do not contradict statements made by the defense witnesses who were deposed: Those witnesses testified simply that they had no knowledge of the Crawford negotiations. There is no basis in the record for rejecting that testimony. It is undisputed that all of Koller's conversations with Crawford were by telephone and that no one other than Crawford and Decarolis was in Decarolis's car when Crawford was presented with documents for her signature. Disclaimers of knowledge by persons who were not present for these conversations are not contradicted by descriptions of what occurred by persons who were present and do have knowledge. The district court properly considered the Koller and Decarolis declarations in ruling on--and in denying, see Part II.C. below--Crawford's motion for partial summary judgment in her favor.

As discussed in Parts II.A. and B. below, we find greater merit in Crawford's challenges to the district court's rulings that she lacked standing to pursue, or was estopped from pursuing, the present action. Nonetheless, we are entitled to affirm the judgment on any basis that is supported by the record, see, e.g., Mauro v. Southern New England Telecommunications, Inc., 208 F.3d 384, 387 n.2 (2d Cir. 2000), and Defendants argue that the dismissal of Crawford's claims may be affirmed in whole or in part on other grounds appearing in the record, including statutes of limitations and the absence of evidence to support essential elements of various of her claims. While we reject some of these grounds, such as statute-of-limitations defenses that were not asserted in their answer to the Complaint, see, e.g., Davis v. Bryan, 810 F.2d 42, 44 (2d Cir. 1987), we find merit, as discussed in Part II.C. below, in the arguments that Defendants were entitled to summary judgment dismissing Crawford's claims other than her TILA and common-law fraud claims.

13

A.  Standing

In granting Defendants' motions to dismiss Crawford's claims for lack of standing, the district court began as follows:

> The act of filing a bankruptcy petition transfers a debtor's assets to the bankruptcy estate, and these assets remain assets of the bankruptcy estate unless returned to the debtor by the operation of law.  Plaintiff unquestionably failed to assert any of these claims in her 2006 bankruptcy, but now contends that she nonetheless has standing to assert her claims [1] because the 2006 bankruptcy was dismissed, rather than discharged, and [2] because Defendants defended similar claims on the merits in the adversary proceeding in Crawford's 2007 bankruptcy filing.

Crawford I, 2011 WL 1118584, at *13.  The court rejected both contentions.  In ruling that Crawford's claims had not revested in her when her 2006 bankruptcy proceeding was dismissed, the court relied principally on Kunica v. St. Jean Financial, Inc., 233 B.R. 46 (S.D.N.Y. 1999) ("Kunica"), and its "concern[] with 'protect[ing] creditors from a debtor who may try to hide assets,'" Crawford I, 2011 WL 1118584, at *14 (quoting Kunica, 233 B.R. at 54).  The district court noted that

> [i]t is "[a] basic tenet of bankruptcy law . . . that all assets of the debtor, including all pre-petition causes of action belonging to the debtor, are assets of the bankruptcy estate that must be scheduled for the benefit of creditors,"

Crawford I, 2011 WL 1118584, at *13 (quoting Kunica, 233 B.R. at 52), and it stated that

> "[c]ourts have held that because an unscheduled claim remains the property of the bankruptcy estate, the debtor lacks standing to bring such claims after emerging from bankruptcy, and the claims must be dismissed,"

Crawford I, 2011 WL 1118584, at *13 (quoting Kunica, 233 B.R. at 53).  The court added that "the fact that Defendants contested these claims in the 2007 adversary proceeding cannot confer standing on Plaintiff because . . . unscheduled assets can only re-vest in the debtor by the operation of law."  Crawford I, 2011 WL 1118584, at *14.

Crawford argued that the dismissal of her 2006 Petition had itself revested her claims

14

in her, citing Central Jersey Freightliner, Inc. v. Freightliner Corp., 987 F.Supp. 289 (D.N.J. 1997), which stated that "[w]hile a plan fixes parties' rights and obligations, dismissal of a bankruptcy case essentially restores the parties to the position they assumed prepetition. See Bankruptcy Code § 349 (addressing effect of dismissal)," 987 F.Supp. at 294.

The district court rejected Crawford's argument. It noted that the New Jersey district court had adopted a "plain reading" of § 349, Crawford I, 2011 WL 1118584, at *13; but it also noted that the equities in that case favored the debtor, which had voluntarily dismissed its bankruptcy case, see id. The court here found that the equities did not favor Crawford, who had taken advantage of the automatic stay provision, see 11 U.S.C. § 362(a), to impede a foreclosure sale and whose 2006 Petition was then ordered dismissed by the bankruptcy court for unreasonable delay that was prejudicial to creditors. See Crawford I, 2011 WL 1118584, at *13-*14. The district court concluded that "because Plaintiff failed to assert any of the claims in this action in her 2006 bankruptcy petition . . . , she lacks standing to assert these claims." Id. at *14. For the reasons that follow, we disagree.

It is a given, of course, that under provisions generally applicable to all bankruptcy cases, the commencement of the proceeding creates a bankruptcy estate. See 11 U.S.C. § 541(a) ("The commencement of a case under section 301, 302, or 303 of this title creates an estate." (emphases added)); id. § 301 (providing for voluntary filings). "Such estate" encompasses, inter alia, with few exceptions, "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (emphasis added); see, e.g., Adelphia Recovery Trust v. Goldman, Sachs & Co., 748 F.3d 110, 115 (2d Cir. 2014) ("Adelphia"); Weber v. SEFCU, 719 F.3d 72, 75 (2d Cir. 2013); Chartschlaa v. Nationwide Mutual Insurance Co., 538 F.3d 116, 122 (2d Cir. 2008) ("Chartschlaa"), cert. denied, 555 U.S. 1213 (2009). And it is established that such interests include

15

causes of action possessed by the debtor at the time of filing. See, e.g., Jackson v. Novak, 593 F.3d 171, 176 (2d Cir. 2010); Olick v. Parker & Parsley Petroleum Co., 145 F.3d 513, 515 (2d Cir. 1998); Seward v. Devine, 888 F.2d 957, 963 (2d Cir. 1989).

We conclude that Crawford has standing to pursue her present claims because her 2006 Petition was dismissed. Although the district court stated that Crawford lacked standing because "unscheduled assets can only re-vest in the debtor by the operation of law," Crawford I, 2011 WL 1118584, at *14, we are persuaded that, because Crawford's 2006 bankruptcy proceeding was dismissed, all of Crawford's assets were indeed revested in her by operation of law. Section 349 of the Code provides, with an exception not relevant here, that unless the bankruptcy court for cause orders otherwise, "a dismissal of a case . . . revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case," 11 U.S.C. § 349(b)(3) (emphases added). Thus, if the debtor owned the property prior to the commencement of the bankruptcy case, a dismissal returns that property to the debtor.

The district court viewed § 349 as overridden by § 554 of the Code, titled "Abandonment of property of the estate." That section provides that after "notice and a hearing," the trustee may "abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a) (without court order); id. § 554(b) (by court order). Subsection (c) of § 554 provides further that, unless the court orders otherwise, "any property scheduled under section 521(a)(1) of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title," id. § 554(c) (emphases added); and subsection (d), on which the district court relied, provides that "property of the estate that is not abandoned under this section and that is not administered in the case

16

remains property of the estate," id. § 554(d) (emphases added).

We cannot view § 554(d) as overriding § 349. As noted above, § 541(a)(1) provides that the debtor's assets become property of the estate "as of the commencement" of the bankruptcy case; this applies whether or not the assets are listed in the required § 521(a)(1) schedule--a schedule that can be filed after the commencement of the case, see Fed. R. Bankr. P. 1007(c). The provision in § 349 for the revesting of assets is similarly broad: It makes no distinction between those that were listed in the debtor's schedule of assets and those that were not; what is revested in the immediately-pre-petition owner or owners is "the property of the estate." 11 U.S.C. § 349(b)(3). The legislative history makes clear that Congress intended that a dismissal would undo the bankruptcy case:

> Subsection (b) specifies that the dismissal [inter alia] revests the property of the estate in the entity in which the property was vested at the commencement of the case. . . . The basic purpose of the subsection is to undo the bankruptcy case, as far as practicable, and to restore all property rights to the position in which they were found at the commencement of the case.

H.R. Rep. No. 95-595, at 338 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6294; see A. Resnick & H. Sommer, 8 Collier on Bankruptcy ¶ 1307.09 (16th ed. rev. 2013). Since the dismissal undoes the bankruptcy case, there is, upon dismissal, no longer any bankruptcy estate; and hence, there is no longer any property of the estate. See, e.g., SEC v. Great White Marine & Recreation, Inc., 428 F.3d 553, 556 (5th Cir. 2005) ("Without a bankruptcy estate, there can be no property of a bankruptcy estate. See 11 U.S.C. § 349(b)(3) (a dismissal 'revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case under this title')."); Martir Lugo v. de Jesus Saez, 721 F.2d 848, 851 (1st Cir. 1983) ("It seems self evident that there is no 'estate' and hence no 'property of the estate' unless there is an existing petition.").

As there no longer remains any "property of the estate" after a case has been dismissed,

§ 554 has no applicability after a dismissal. Thus, although subsections (c) and (d) of § 554 prescribe different treatments for assets at the time a bankruptcy case is "closed," depending on whether they were or were not listed in a § 521(a)(1) schedule, the dismissal of the case under § 349, automatically revesting all of the property of the estate in its prior owners, means that there are no assets remaining to be abandoned or administered.

We are not persuaded to reach the opposite conclusion by the opinion of the district court in Kunica, which dealt with a debtor that, despite the dismissal, received relief that was tantamount to a discharge, and which is, in any event, not binding on us. Nor are we persuaded by Defendants' reliance on this Court's decision in Chartschlaa, in which we stated that "undisclosed assets automatically remain property of the estate after the case is closed," 538 F.3d at 122 (see Defendants' brief on appeal at 23 and passim). Chartschlaa did not involve a dismissal.

In sum, when Crawford's First Bankruptcy case was dismissed, the property of the bankruptcy estate revested in her by operation of law. To the extent that the district court declined to apply § 349 on the basis that the equities did not favor Crawford, that rationale bespeaks estoppel rather than lack of standing. We conclude that, by application of § 349, Crawford has standing to pursue her present claims.

B. Estoppel

The district court indeed ruled, as an alternative to its conclusion as to standing, that Crawford "is collaterally estopped from bringing [her present] claims." Crawford I, 2011 WL 1118584, at *14. The parties agree that the court may have intended a reference to judicial estoppel, rather than collateral estoppel--which applies only to issues that were litigated and actually decided

18

in a prior case. They disagree, of course, as to whether judicial estoppel was applicable. We conclude that it was not.

"Judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." Pegram v. Herdrich, 530 U.S. 211, 227 n.8 (2000). In deciding whether to invoke judicial estoppel, we look principally to see whether "a party's later position . . . [is] clearly inconsistent with its earlier position," and whether the court in the first proceeding adopted the party's position. New Hampshire v. Maine, 532 U.S. 742, 750-51 (2001) (internal quotation marks omitted). "[B]ecause the doctrine is primarily concerned with protecting the judicial process, relief is granted only when the risk of inconsistent results with its impact on judicial integrity is certain." Adelphia, 748 F.3d at 116 (internal quotation marks omitted).

In Crawford's 2006 bankruptcy proceeding, her failure to list her present causes of action among her assets was tantamount to a representation that she had no such claims. However, there was no ruling relating to that representation. The court did not confirm Crawford's proposed plan, address its merits, or mention her assets. It simply dismissed her petition, stating principally that she "ha[d] created unreasonable delay . . . prejudicial to creditors . . . [,] ha[d] failed to appear at the confirmation hearing," and "ha[d] failed to remain current in proposed plan payments to the trustee." Bankruptcy Court Order dated April 12, 2007. As there was no ruling relating to Crawford's present claims or to her assets generally, there is no risk of inconsistent adjudications. We conclude that there is no ground for judicial estoppel.

19

C. <u>Motions for Summary Judgment on Other Grounds</u>

Turning to Defendants' more common grounds for their motions for summary judgment, we apply the usual principles. The moving party bears the burden of showing the absence of a genuine dispute as to any material fact, <u>see</u> <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970); where the nonmoving party will bear the burden of proof on an issue at trial, the moving party may satisfy its burden by "point[ing] to an absence of evidence to support an essential element of the nonmoving party's" case, <u>Brady v. Town of Colchester</u>, 863 F.2d 205, 210-11 (2d Cir. 1988). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

In considering whether summary judgment is appropriate, a court is required to view the evidence in the light most favorable to the party against whom the motion was made and to draw all reasonable inferences in favor of that party. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986). The court "'<u>must disregard all evidence favorable to the moving party that the jury is not required to believe</u>.'" <u>Jasco Tools, Inc. v. Dana Corp.</u>, 574 F.3d 129, 152 (2d Cir. 2009) (quoting, with emphasis, <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 151 (2000)).

When both sides have moved for summary judgment, the court must apply the above principles to each motion separately. On each motion it must view the evidence in the light most favorable to the party against whom summary judgment is sought. Thus, when the district court in the present case considered Crawford's motion for partial summary judgment in her favor, it properly viewed the declarations of Koller and Decarolis in the light most favorable to Defendants. We see

20

no error in the court's conclusion that a jury would be entitled to credit their versions of the events. And as the jury would not be required to believe Crawford's version of the events, the court properly disregarded her version in deciding her motion. Crawford's motion for partial summary judgment in her favor on the issues of liability was properly denied.

We find merit, however, in Defendants' contentions that, as to most of the claims asserted in the Complaint, there was at least one element as to which Crawford failed to adduce sufficient evidence of a genuine dispute of material fact to be tried. Our review of the record persuades us that, on this basis, Defendants were entitled to summary judgment dismissing Crawford's RICO, ECOA, New York General Business Law, and negligent misrepresentation claims. We conclude, however, that there are genuine disputes of material fact for trial with respect to Crawford's TILA and fraud claims.

### 1. The RICO Claims

Crawford asserted substantive RICO claims under 18 U.S.C. § 1962(c), along with claims that Defendants conspired to violate that section in violation of 18 U.S.C. § 1962(d). Subsection (c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

To establish a violation of § 1962(c), a plaintiff must show that the defendant conducted, or participated in the conduct, of a RICO enterprise's affairs through a pattern of racketeering activity. See, e.g., Cruz v. FXDirectDealer, LLC (FXDD), 720 F.3d 115, 120 (2d Cir.

2013). To establish a violation of § 1962(d), a plaintiff must show that the defendant agreed with at least one other entity to commit a substantive RICO offense. See, e.g., Baisch v. Gallina, 346 F.3d 366, 376-77 (2d Cir. 2003). Defendants contend that Crawford failed to adduce evidence sufficient to establish a number of the elements of these RICO claims. We agree that Crawford failed to point to evidence sufficient to establish either a pattern of racketeering activity or an agreement to engage in a pattern of such activity, and we thus need not reach Defendants' other RICO arguments.

"'[R]acketeering activity,'" as defined in RICO, may consist of any of a number of criminal offenses, 18 U.S.C. § 1961(1), including mail fraud in violation of 18 U.S.C. § 1341, and wire fraud in violation of 18 U.S.C. § 1343. A "'pattern of racketeering activity'" consists of, inter alia, "at least two acts of racketeering activity," 18 U.S.C. § 1961(5); and in order to prove such a "pattern," a civil RICO plaintiff also "must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity," H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 239 (1989) (emphasis in original). The requisite continuity may be found in "either an 'open-ended' pattern of racketeering activity (i.e., past criminal conduct coupled with a threat of future criminal conduct) or a 'closed-ended' pattern of racketeering activity (i.e., past criminal conduct 'extending over a substantial period of time')." GICC Capital Corp. v. Technology Finance Group, Inc., 67 F.3d 463, 466 (2d Cir. 1995), cert. denied, 518 U.S. 1017 (1996).

Crawford asserted principally that Defendants engaged in wire fraud, consisting of interstate or international telephone conversations she had with Koller and of Tribeca's solicitation from her of faxed documents in order to facilitate the allegedly promised bridge loan; she also speculated, without personal knowledge--and hence insufficiently to forestall summary judgment-- that, via electronic transmissions, Defendants made monthly reports to consumer credit reporting

22

agencies with regard to her default on her Tribeca loan. Crawford asserted that Defendants engaged in mail fraud, consisting of Franklin's mailing to her of mortgage statements in January and February 2005 and default notices in March and April 2005, and of sporadic mailings by Tribeca's counsel in 2005-2010 relating to Tribeca's state-court foreclosure action. We cannot conclude that the admissible evidence proffered by Crawford suffices to permit a rational inference of either open-ended or closed-ended continuity of racketeering activity.

The mail fraud and wire fraud statutes prohibit a person who "devised or intend[ed] to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," from using the mails or interstate or foreign wire facilities "for the purpose of executing such scheme or artifice or attempting so to do." 18 U.S.C. § 1341 (mail fraud); id. § 1343 (wire fraud). Although the mailed or wired communication need not itself be fraudulent to violate these sections, it must, by the terms of the statutory sections, be made in furtherance of the fraudulent scheme. Where an alleged RICO "enterprise primarily conducts a legitimate business, there must be some evidence from which it may be inferred that the predicate acts"--which must be in furtherance of fraud in order to constitute mail or wire fraud--"were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." Cofacrèdit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 243 (2d Cir. 1999) ("Cofacrèdit"). Mere mailings of monthly statements seeking payment with respect to a single established debt--or communications to the state court in connection with an action on that debt--do not, without more, amount to or suggest a threat of continued criminal activity; the mailings in this case cannot even be viewed as furthering the alleged fraud, for they disclosed to Crawford the existence of the Tribeca Mortgage of which she claims to have been unaware.

23

Nor did Crawford present any evidence that Tribeca's allegedly fraudulent statements in Koller's telephone conversations with her with regard to a loan--or the allegedly fraudulent execution of the Tribeca mortgage to Crawford--evinced a threat of future fraudulent mortgage business practices or was characteristic of Defendants' normal practice. Although Tribeca, before discontinuing its lending operations in 2007, made some 250 loans a year, Crawford presented no evidence of any other loan that was allegedly procured through any manner of fraud.

Crawford argues that "[t]he existence of only one victim and one scheme suffices for a 'pattern' where there are repeated economic injuries" (Crawford reply brief on appeal at 25), relying principally on Uniroyal Goodrich Tire Co. v. Mutual Trading Corp., 63 F.3d 516 (7th Cir. 1995). But that case, while involving only a single victim, involved fraudulent acts that were numerous, varied, and disparate, see id. at 519-20, in contrast to the alleged fraud here, which was to sign Crawford up for a $504,000 mortgage. Thus, while the Seventh Circuit in that case found that such numerous and varied fraudulent acts sufficed to show a pattern of racketeering activity against that lone victim, that court has reasoned that "multiple acts of mail fraud in furtherance of a single episode of fraud involving one victim and relating to one basic transaction cannot constitute the necessary pattern," Tellis v. United States Fidelity & Guaranty Co., 826 F.2d 477, 478 (7th Cir. 1986); see also Slaney v. The International Amateur Athletic Federation, 244 F.3d 580, 599 (7th Cir.), cert. denied, 534 U.S. 828 (2001). Given the routine use of mail and wire communications in business operations, we agree with that view, as well as with the view of the First Circuit that "RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." Efron v. Embassy Suites (Puerto Rico), Inc., 223 F.3d 12, 20 (1st Cir. 2000), cert. denied, 532 U.S. 905 (2001).

24

We conclude that Crawford's evidence was insufficient to show the necessary pattern and that Defendants were entitled to summary judgment dismissing her claims under § 1962(c).

In addition, we conclude that Defendants were entitled to summary judgment dismissing her § 1962(d) RICO conspiracy claims. "'A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense . . . .'" Cofacrèdit, 187 F.3d at 245 (quoting Salinas v. United States, 522 U.S. 52, 65 (1997)). Crawford presented no evidence of any agreement by Defendants to engage in conduct of the type that would be sufficient to constitute a pattern of racketeering activity.

## 2. The ECOA Claims

ECOA provides that it is "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction[,] . . . on the basis of race, color, religion, national origin, sex or marital status, or age." 15 U.S.C. § 1691(a). Defendants contend that summary judgment dismissing the ECOA claims should be affirmed because Crawford failed to adduce evidence that she was discriminated against on account of a protected characteristic. We agree.

Crawford argues that Defendants "[m]isconstrue" her ECOA claims and states, citing 15 U.S.C. § 1691(d)(2) ("[e]ach applicant against whom adverse action is taken [is] entitled to a statement of reasons for such action from the creditor"), that her ECOA claims were "based on Defendants' failure to give the mandated adverse action notice, since Defendants extended credit different from what Ms. Crawford sought." (Crawford reply brief on appeal at 23.) However, this argument does not describe the ECOA claims that were asserted in Crawford's Complaint, which alleged only discriminatory action (see Complaint ¶¶ 82-86).

25

Crawford does not challenge Defendants' assertion that she failed to produce evidence of discrimination. In her opposition to Defendants' summary judgment motions, the only references to discrimination were her assertion that Koller had advised her that Community would foreclose very quickly because she is African-American, and a conclusory reference to "Defendants' discriminatory actions" (e.g., Crawford Decl. ¶ 14). In her deposition, Crawford merely testified, "they discriminated against me because I was African American by giving me a larger than average loan and taking my money and not disclosing what they were doing." (Deposition of Linda Crawford, April 17, 2009, at 94.) These conclusory assertions were insufficient to create a genuine issue to be tried as to the discrimination element of Crawford's ECOA claims.

### 3. The New York General Business Law Claims

The New York General Business Law makes it unlawful to engage in "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York] state . . . ." N.Y. Gen. Bus. Law § 349(a). To state a claim under GBL § 349, a plaintiff "must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." Stutman v. Chemical Bank, 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 895 (2000). To show that the challenged act or practice was consumer-oriented, a plaintiff must show that it had "a broader impact on consumers at large": "Private contract disputes, unique to the parties, for example, would not fall within the ambit of the statute . . . ." Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529, 532 (1995).

Crawford presented no evidence that the acts of which she complained, e.g.,

26

Defendants' alleged "obtaining [of] signatures under false pretenses," "creati[on of] mortgages through forgery," and "imposi[tion of] exorbitant 'closing costs' without ever informing consumers of the same" (Crawford reply brief on appeal at 32), were acts committed against consumers in general or indeed against anyone other than Crawford. Summary judgment dismissing these claims is appropriate.

### 4. The Negligent Misrepresentation Claims

To prevail on a claim of negligent misrepresentation under New York law, a plaintiff must show "(1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information." J.A.O. Acquisition Corp. v. Stavitsky, 8 N.Y.3d 144, 148, 831 N.Y.S.2d 364, 366 (2007). "[L]iability in the commercial context is 'imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified.'" Eternity Global Master Fund Limited v. Morgan Guaranty Trust Co. of New York, 375 F.3d 168, 187 (2d Cir. 2004) (quoting Kimmell v. Schaefer, 89 N.Y.2d 257, 263, 652 N.Y.S.2d 715, 719 (1996)).

Crawford's only attempt to show the requisite special relationship between herself and Defendants consists of her argument that "Defendants claimed special expertise in bridge loans to forestall foreclosures" (Crawford reply brief on appeal at 32). That argument is foreclosed by the New York Court of Appeals decision in Greenberg, Trager & Herbst, LLP v. HSBC Bank USA, 17 N.Y.3d 565, 934 N.Y.S.2d 43 (2011), which held that "an arm's length borrower-lender relationship . . . does not support a cause of action for negligent misrepresentation," id. at 578, 934 N.Y.S.2d at 50

27

(internal quotation marks omitted).

5.  The TILA Claims

TILA is designed "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a). Together with its implementing Regulation Z, and under specified circumstances, TILA requires disclosure by the "creditor" of, inter alia, the "'amount financed,'" id. § 1638(a)(2)(A), the "'finance charge,'" id. § 1638(a)(3), and the "number, amount, and due dates or period of payments scheduled to repay the total of payments," id. § 1638(a)(6), as well as rescission rights, see id. § 1635; 12 C.F.R. § 226.23(b)(1). "The term 'creditor' refers only to a person who both (1) regularly extends . . . consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness . . . ." 15 U.S.C. § 1602(g). We reject Defendants' contention that Crawford failed to adduce sufficient evidence on the "creditor" and "disclosure" elements of her TILA claims.

Defendants argue on appeal that only Tribeca is a creditor within the meaning of TILA. Although the Tribeca Mortgage and note in the record name only Tribeca as Crawford's "Lender," both Franklin and Tribeca admitted in ¶ 65 of their answer to the Complaint that they are creditors within the meaning of TILA, and thus subject to its requirements. "Facts admitted in an answer, as in any pleading, are judicial admissions that bind the defendant throughout th[e] litigation." Gibbs

28

ex rel. Estate of Gibbs v. CIGNA Corp., 440 F.3d 571, 578 (2d Cir. 2006).

As to whether Defendants failed to make the disclosures required by TILA, Crawford testified in her deposition that in the course of her transaction with Defendants, she received no documents to keep and that signatures on TILA disclosure statements Defendants had on file were not hers. Defendants' proffer of, inter alia, the Decarolis Declaration, indicating that he likely followed his usual practice of providing loan applicants with copies of the requisite papers at closings, did not entitle Defendants to summary judgment dismissing the TILA claims. While that declaration provided evidence that the court was required to accept in addressing Crawford's motion for summary judgment in her favor, the court was instead required to credit Crawford's sworn version of the events, and to disregard Defendants' evidence that a jury would not be required to believe, when it ruled on Defendants' own motions for summary judgment.

The record thus reveals that there are factual issues to be tried with respect to Crawford's TILA claims.

6. The Fraud Claims

To prove a claim of fraud under New York law a plaintiff must show, by clear and convincing evidence, see Gaidon v. Guardian Life Insurance Co. of America, 94 N.Y.2d 330, 349-50, 704 N.Y.S.2d 177, 186 (1999), that the defendant made a material misrepresentation of fact, knowing of its falsity and with the intent to induce reliance, and that the plaintiff justifiably relied on that misrepresentation to her detriment, see Eurycleia Partners, LP v. Seward & Kissel, LLP, 12 N.Y.3d 553, 559, 883 N.Y.S.2d 147, 150 (2009). Defendants argue principally that Crawford failed to adduce evidence that she relied on Defendants' alleged misrepresentations to her detriment. We disagree.

29

Although Defendants argue that Crawford could not have relied on the alleged misrepresentations as to the terms of the loan because she "alleges that she did not know that she was entering into a loan at all" (Defendants' brief on appeal at 52 (citing Complaint ¶ 24)), this argument mischaracterizes her claims. Paragraph 24 of the Complaint alleges not that Crawford was unaware that she was entering into a loan agreement, but rather that she was unaware that the loan would be secured by a mortgage on her home. Crawford's sworn descriptions of her conversations with Koller provide evidence, inter alia, (a) that she was led to believe she was being offered a "bridge loan" of $35,000 without a mortgage, to stave off foreclosure on existing mortgages totaling some $400,000, (b) that in reliance on Koller's representations that Franklin and Tribeca needed "specimen signatures" from her to proceed with the bridge loan, she provided such signatures, and (c) that, without her consent, those signatures were instead used to bind her to a $504,000 mortgage from Tribeca. Crawford adduced sufficient evidence of reliance.

Although Defendants argue that any dispute as to whether there was reliance does not concern an element that is material, on the basis that Crawford failed to adduce sufficient evidence to support certain other elements of her fraud claims, we reject that argument as unsupported by the record. For example, Defendants argue that Franklin could not be held liable because there was "no evidence that Franklin had anything to do with the alleged conduct that forms the basis for Plaintiff's claims" (Defendants' brief on appeal at 53). But Crawford presented evidence that Franklin and Tribeca shared a single hiring department, that Koller's supervisor reported to Franklin's chief executive officer, that a Franklin vice president was involved in her loan transaction, and that a Franklin document referred to her loan as a "Franklin Credit Loan." Such evidence is sufficient to create a genuine issue as to Franklin's participation. Defendants also argue that because Crawford

30

managed to stave off foreclosure on the Tribeca Mortgage for several years while making no mortgage payments, the allegedly fraudulent Tribeca Mortgage caused her no injury. We cannot accept this argument as a matter of law. Crawford was charged more than $35,000 in settlement fees in the mortgage transaction, and she eventually lost her home in foreclosure. Whether she suffered injury is a question to be answered by a factfinder.

In sum, whether to credit Crawford's testimony is a matter for the finder of fact at trial, not for a court in considering summary judgment. We conclude that, with respect to her fraud claims, Crawford's sworn statements as to the representations made and as to her reliance on them to her detriment, taken as true for purposes of the motions for summary judgment against her, presented genuine issues of fact to be tried.

CONCLUSION

We have considered all of the parties' contentions in support of their respective positions on this appeal and, except to the extent indicated above, have found them to be without merit. For the reasons stated, we affirm so much of the judgment as (1) denied Crawford's motion for partial summary judgment in her favor and (2) granted Defendants' motions for summary judgment dismissing her claims under RICO, ECOA, and New York General Business Law § 349, and for negligent misrepresentation. We vacate so much of the judgment as dismissed Crawford's claims for violation of TILA and for common-law fraud, and we remand for further proceedings on those claims.

No costs.